[Crim. No. 17722. First Dist., Div. Three. May 17, 1979.]

THE PEOPLE, Plaintiff and Respondent, v.
CLIFFORD HARRIS et al., Defendants and Appellants.

**COUNSEL**

Frank Offen and Quin Denvir, State Public Defender, under appointments by the Court of Appeal, Clifton R. Jeffers, Chief Assistant State Public Defender, Dennis P. Riordan and Thomas N. Griffin, Deputy State Public Defenders, for Defendants and Appellants.

George Deukmejian, Attorney General, Jack R. Winkler, and Robert H. Philibosian, Chief Assistant Attorneys General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth, Karl J. Phalen, A. Wells Petersen, Jay M. Bloom and Lillian Lim Quon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**FEINBERG, J.**—Appellants Harris and Baker were charged in one count with kidnaping (Pen. Code, § 207) and in three counts, as principal or aider and abettor, with rape by force and by threats of great bodily harm (Pen. Code, § 261, subds. 2 and 3). In addition, Harris was charged with one count of robbery (Pen. Code, § 211). Appellants were convicted as charged.

The questions before us are: (1) was Harris denied a speedy trial; (2) was the jury properly instructed on the issue of consent; (3) did the court commit prejudicial error in excusing defense witnesses on Fifth Amendment grounds; (4) was the failure to instruct, *sua sponte,* on lesser included offenses with respect to Harris' conviction of robbery error; and (5) should the robbery conviction be reversed because of the references to a lie detector test?

### The Evidence

Denise Dixon, the alleged victim of the kidnaping, rapes and robbery, testified that she boarded a public bus on which there were three males, two of whom were playing a card game.[1]

One of the players (Baker) came up to her and asked her for money. When she refused, he snatched her purse and took $15 from it. Baker then played cards on the bus with one of the other male passengers (Harris).

Dixon kept asking for the return of her money. It was not returned though both appellants promised to return it a number of times. Eventually, Harris, Baker, and the third male (C. Jackson) got off the bus. Dixon followed them off still seeking the return of her money.

The three men went across the street to a service station where Harris had a car parked. Dixon followed still intent upon getting her money back.

When she arrived at the car, she again asked for her money. Appellants were then standing outside the car. Harris got into the car and pulled

---

[1]The card game apparently known as "Three-Card Molly" is a version of the "shell game," played with playing cards instead of three shells and a pea, and with similar results.

Dixon in, Baker and the third man got in and Harris drove off. As they drove, Baker kept pushing Dixon's head down so that, Dixon supposed, she couldn't see where they were going.

Shortly thereafter, the third male was dropped off and he no longer figures in the incidents.

Eventually, Dixon's testimony continues, she was taken to an apartment. Baker, Harris and Dixon entered the apartment. In the apartment was a man (G. Jackson) and two women. Harris, Baker and Dixon went directly to a bedroom. In the bedroom, with only the three present, Harris told Dixon that he would try to get her money back by playing Three-Card Molly and winning. Since he had no money, he wagered his leather coat. Harris lost (as could have been anticipated). He then told Dixon that because she had made him lose his coat, he was going to have intercourse with her.

Baker then left the bedroom. Harris undressed Dixon. She resisted by telling him to stop. Harris then had coitus with Dixon (the first rape count). After the act of intercourse, Harris dressed and left the bedroom. Thereupon, Baker entered the bedroom and said to Dixon that "he had to get his, too." He told Dixon to orally copulate him. Dixon refused, whereupon he "did it the same way . . . Harris did" with Dixon struggling (the second rape count). Baker then dressed and left the bedroom.

Moments later, Baker and Harris reentered the bedroom. Within a few minutes thereafter, a third man (Johnson) entered the bedroom. Johnson gave Baker $40 to have intercourse with Dixon. Baker and Harris left the bedroom and Johnson had intercourse with Dixon (the third rape count). She struggled with him as she had "with all of them." Johnson then left.

Baker and Harris reentered. Harris then removed from Dixon's finger a school class ring, saying that because she had made him lose his coat trying to win her money back, he was going to try to win his coat back with her ring. Baker and Harris then played cards; Baker won and pocketed the ring. Harris and Baker then left the apartment. Subsequently, Dixon, without any further molestation, dressed and left.

Harris testified. Since his testimony differed from Dixon's only in certain crucial aspects, we shall only delineate the differences.

According to Harris, Baker approached Dixon on the bus and ascertained she had money. Baker then asked Harris and Dixon if they wanted to play Three-Card Molly. Harris pretended ignorance of the game and Baker explained it. Baker offered to bet $20. Dixon said she only had $15. Harris said he would add $5. The game was played and Baker won. Baker asked Dixon to play again. Dixon said she had no more money. Harris then told her that if she would come with them he would try to get more money in an endeavor to win her money back. After considerable persuasion, Dixon agreed.

Dixon, appellants and a third male (C. Jackson) got off the bus, walked to the gas station and got into Harris' car. Harris denied forcing Dixon into the car and denied that while she was in the car any force or threat was directed at her by anyone. When they arrived at the apartment (it was G. Jackson's apartment), two women, C. Jackson and Johnson were present. Appellants and Dixon went into the bedroom and the game resumed. Harris played against Baker, wagered his coat and lost. Dixon then asked Harris how she could get her money back. He told her that she could gamble her clothing, he would gamble his, and they would play against Baker. They so proceeded and they lost. Rapidly thereafter, both Dixon and Harris were reduced to their undergarments. At that point, Harris pretended to be upset, telling Dixon that she had made him lose. Baker then told Dixon that he didn't want her clothes so he would give her an opportunity to win them back. However, if she lost, she would have to go to bed with Harris. Dixon agreed, played, lost, and Harris then had intercourse with her, Baker having gone out of the bedroom and closed the door. Harris did not use force to commit intercourse nor did Dixon physically resist or protest.

Upon completion of coitus, Harris got dressed, left the bedroom and Baker entered. The door was closed and Harris did not know what took place therein.

When Harris returned to the bedroom, Baker was dressed; Dixon was still in her underclothes. Baker then left and returned with Johnson. Johnson said he would pay $40 to go to bed with Dixon. Baker told Dixon that if she went to bed with Johnson, she would have $40 to win her clothing back. Dixon agreed. Baker gave her the $40; Baker and Harris left the bedroom and closed the door.

Thereafter, Harris and Baker reentered the room; Johnson was gone. Dixon played against Baker and bet the $40 and her high school ring,

which she took off her finger, against her clothes and a sum of money. She lost again. Baker took the $40 and the ring. Harris denied taking the ring off Dixon's finger. Harris then bet his car against the return of Dixon's clothes. He won. He returned the clothes to Dixon. She dressed. Harris offered her a ride. She declined. Harris and Baker left the apartment at which time the two women and G. Jackson were still there.

Baker testified; in substance his testimony was identical to Harris' testimony. He admitted to an act of intercourse with Dixon.

There was evidence to corroborate Dixon's testimony, in part, in that an attendant at the service station where Harris' car was parked testified that on the date in question, he had seen a black woman forced into a car by a black male (appellants and Dixon are black).

On the other hand, there was some evidence that tended to corroborate, in part, the Harris-Baker version. The bus driver testified that he saw Dixon take money out of her purse and participate in a card game that was being played in his bus.

Dixon, upon being interviewed by the police and by a doctor in the course of a medical examination, gave several versions of what had happened, which were inconsistent in some important particulars with her testimony at trial. Baker and Harris, when first questioned by the police, told substantially the same story they testified to except that each initially denied having intercourse with Dixon.

### I. *Was Appellant Harris Denied a Speedy Trial?*[2]

■ Two days after the incident, both appellants were arrested therefor. They remained in custody for some five days. No complaint was filed. Appellants were released pursuant to Penal Code section 849, subdivision (b)(1). Approximately 95 days after the date of the initial arrest, a complaint was filed against appellants' arrest, charging the instant offenses.

Appellant Harris contends that this "delay" of some 95 days operated to deprive him of his right to a speedy trial.

---

[2]Both appellants, before trial, moved vainly to dismiss the information on the ground of lack of a speedy trial. Baker has not raised the issue here. However, the facts in this regard are identical as to both appellants. Thus, what we have to say with regard to Harris applies equally to Baker.

It is clear that appellant was not deprived of his California constitutional right to a speedy trial. That right springs into being *only* when the defendant has been formally charged by complaint or indictment. (*People v. Hannon* (1977) 19 Cal.3d 588 [138 Cal.Rptr. 885, 564 P.2d 1203]). Under the Sixth Amendment to the federal Constitution, the right to a speedy trial does not arise until the defendant is charged by information or indictment or has been held to answer. (*Id.,* at p. 605; *United States* v. *Marion* (1971) 404 U.S. 307 [30 L.Ed.2d 468, 92 S.Ct. 455].)

Since no contention has been made nor could any be made that there was any postcomplaint delay, there was no denial of a speedy trial.

This, however, does not dispose of the issue. In California, a doctrine that has come to be known as "preindictment delay" has developed so that under some circumstances, a delay in filing charges may operate to deprive a defendant of due process of law.

In the case at hand, the delay, if there was any, constituted preindictment delay. We proceed, therefore, to an analysis based on preindictment delay—due process grounds.

In *Scherling* v. *Superior Court* (1978) 22 Cal.3d 493 [149 Cal.Rptr. 597, 585 P.2d 219], the touchstone as to whether preindictment delay operated to deprive a defendant of due process was articulated as follows: "The ultimate inquiry in determining a claim based upon due process is whether the defendant will be denied a fair trial. If such deprivation results from unjustified delay by the prosecution coupled with prejudice, it makes no difference whether the delay was deliberately designed to disadvantage the defendant, or whether it was caused by negligence of law enforcement agencies or the prosecution. In both situations, the defendant will be denied his right to a fair trial as a result of government conduct. [Citation.] ▮ Thus, although delay may have been caused only by the negligence of the government, the prejudice suffered by a defendant may be sufficient when balanced against the reasons for the delay to constitute a denial of due process." (At p. 507.)

Here, the delay was occasioned (1) by the investigating officer's desire to locate and interview witnesses, (2) by the deputy district attorney assigned the case taking time to study the case preparatory to filing charges and arranging (with some difficulty) an interview with Dixon, and (3) in part, vacations taken both by the investigation officer and the deputy district attorney. Considering that a lapse of time of some 95 days is involved, it would not appear that the delay was "unjustified."

But even if the delay was unjustified, there was no prejudice. Appellant argues that by reason of the delay, he was unable to locate the two women who had been in the apartment at the time of the alleged rape. He points out they could have testified that they heard neither outcries from Dixon nor sounds of a struggle.

First, the two women were not present at the time Dixon entered Harris' car. Therefore, they could not have testified as to the kidnaping charge.

Second, with respect to the rape charges and the robbery, all the events took place in a closed bedroom and the two women were never present.

Third, Dixon testified that she only spoke in a "loud" voice. She never screamed or shouted for help. It is only speculative to suggest that her voice would have been audible and the words discernible to the two women.

Fourth, even if the two women had testified that they heard nothing, it would only have minimal probative value, under the circumstances present, as to what Dixon was saying or doing.

Fifth, counsel for appellant made something less than a persuasive showing that he had used due diligence in attempting to find the two women.

We conclude that Harris was not denied due process of law.

## II. *Was the Jury Properly Instructed on the Issue of Consent?*

The trial court, on its own motion, gave CALJIC No. 1.23. In pertinent part, the instruction recites that "To constitute consent on the part of a person to a criminal act or transaction, he must act freely and voluntarily *and not under the influence of fraud,* threats, force or duress; . . ." (Italics added.)

■ On the issue of consent, from an analytic standpoint, there are two kinds of fraud: fraud in the fact and fraud in the inducement. The distinction between the two is as follows: in fraud in the fact, the victim is fraudulently induced to consent to the doing of act X; the perpetrator of the fraud, in the guise of doing act X, actually does act Y; in fraud in the

inducement, the victim is fraudulently induced to consent to the doing of act X and the perpetrator of the fraud does commit act X.

Fraud in the fact, it has been said, vitiates consent. (See 1 Witkin, Cal. Crimes, § 290.) It appears equally reasonable to say that where there is fraud in the fact, there was no consent to begin with. Consent that act X may be done is not consent that act Y be done, when act Y is the act complained of.

On the other hand, fraud in the inducement does not vitiate consent. (Witkin, *op. cit. supra.*) "[T]he basic common law rule [is] that, unless there is statutory language to the contrary, whenever lack of consent is a necessary element of a crime, the fact that consent is obtained through misrepresentation will not supply the essential element of nonconsent." (*People* v. *Cook* (1964) 228 Cal.App.2d 716, 719 [39 Cal.Rptr. 802]; accord, *People* v. *Donell* (1973) 32 Cal.App.3d 613, 617-618 [108 Cal.Rptr. 232]; see Perkins, Criminal Law (2d ed. 1969) ch. 9, § 3, pp. 964-969.)

We now apply these principles to the case at hand.

A. *The conviction of kidnaping (Pen. Code, § 207)*

█  It is settled that where a victim consents to being taken away, there can be no conviction under Penal Code section 207, even though the consent was obtained by a fraudulent misrepresentation, except in certain specific situations. (*People* v. *Stephenson* (1974) 10 Cal.3d 652, 666 [111 Cal.Rptr. 556, 517 P.2d 820]; *People* v. *Rhoden* (1972) 6 Cal.3d 519, 526-527 [99 Cal.Rptr. 751, 492 P.2d 1143].)

*Rhoden* is particularly illuminating. That case was decided on the basis that the defendant had had inadequate appellate counsel before the Court of Appeal. The court pointed out that among other failures of appellate counsel, he had failed to raise the issue that CALJIC No. 1.23 had erroneously been given in a situation similar to the case at bench, i.e., a kidnaping conviction where the evidence indicated that the victim had, by fraudulent misrepresentations, been induced to consent to the asportation.

Here, while there was substantial evidence to support a nonconsensual asportation and therefore the verdict (the testimony of Dixon and the service station attendant), there was also evidence to support the proposition that Dixon had been induced to enter the car by the

fraudulent misrepresentations that she would be able to win her money back (the testimony of Baker and Harris), in which event appellants would not have been guilty of violating Penal Code section 207. We say "fraudulent misrepresentation" because, as must be obvious, the game was rigged. As Baker testified, the way he played the game, there was no way he was going to lose. It is equally obvious that Harris was a part of the swindle, his role demotically known as "the shill."

The vice of giving CALJIC No. 1.23 was that the jury was told that fraud vitiated consent. Thus, from the record, it cannot be said whether the jury convicted because they believed Dixon's version, in which case there would be no error, or because they believed the Baker-Harris version, and since the fraud was obvious, followed the court's instruction, CALJIC No. 1.23, that there was no consent because of the fraud.

Because, on the record, this was a close case, we are of the view that there is a reasonable probability that a result more favorable to appellants would have been reached in the absence of the error.[3] (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) Accordingly, we reverse.

### B. *The convictions of rape (Pen. Code § 261, subds. 2 and 3*

We have found no reported California case involving the giving of CALJIC No. 1.23 where, on the evidence, it appeared that there may have been fraud in the inducement to an act of coupling.

We observe, however, that in 1978 (subsequent to the trial herein), the use note to CALJIC No. 1.23 was amended to add the statement that the instruction "should not be given in connection with a prosecution for forcible rape" though no citation of authority is given therefor.

■ It appears to us that the analysis, *ante,* with regard to the kidnaping charge would appear equally applicable to the rape charges.

Just as Penal Code section 207 internally indicates that fraud in the inducement is kidnaping only in the limited situations spelled out in this section, so Penal Code section 261 internally indicates that fraudulent

---

[3]The jury was out two days. In the course of their deliberations, they asked to have read back, inter alia, (1) the bus driver's testimony (this testimony tended to show that Dixon had participated in the card game); (2) Baker's testimony on how the game was played, including his testimony that he couldn't lose; and (3) CALJIC No. 1.23.

misrepresentation inducing sexual intercourse is rape only in the limited situations where the victim is induced to consent to conjugation where the perpetrator misrepresents himself as the victim's husband. (Pen. Code, § 261, subd. 5.) It seems quite clear that nonconsent of the victim is an essential element of rape under Penal Code section 261, subdivisions 2 and 3 and that fraud in the inducement does not vitiate consent. It is to be noted, too, that a different Penal Code section, section 266, specifically provides, in part, that "every person who, by any false pretenses, false representation, or other fraudulent means, procures any female to have illicit carnal connection with any man, is punishable [alternatively by state prison or county jail or a fine]." On appellants' account, that is precisely what happened.

Respondent concedes as much. He argues that while the giving of CALJIC No. 1.23 may be error, it was not prejudicial error. The form of his argument is that the "fraud" referred to in CALJIC No. 1.23 is fraud in the fact. Since the evidence showed fraud in the inducement, the jury could not have been misled.

The argument is specious. CALJIC No. 1.23 simply uses the word "fraud" and does not explain it further. If the trial court had instructed the jury on the difference between fraud in the fact and fraud in the inducement and told the jury that the former vitiated consent whereas the latter did not, then respondent's conclusion would be sound. But the trial court gave no such instruction to the jury. To believe that the jury, without instruction, understood the difference between the two types of fraud and the effect thereof on the issue of consent is to believe in fairy tales.

Respondent further argues that even if the first two rape counts (counts II and III) must be reversed, i.e., where Harris was the rapist and Baker the aider and abettor, and Baker the rapist with Harris the aider and abettor, the third rape count (count IV) where John Doe (Johnson) was the alleged rapist and Baker and Harris were aiders and abettors, should not be reversed because there was no evidence of a fraudulent misrepresentation in connection therewith. Respondent, however, overlooks Baker's testimony that he told Dixon that if she agreed to have sexual intercourse with Johnson, she would get $40 with which she could again gamble in an endeavor to win back her clothes. Thereupon, Dixon consented and did subsequently wager and lose again. Thus, the evidence, if believed, would again show that Dixon was fraudulently induced to consent to Johnson having intercourse with her.

As we have said in the context of the kidnaping conviction, we cannot say which version the jury believed. The case being closely balanced, we are compelled to reverse the three rape convictions.

### III. *Did the Court Commit Prejudicial Error in Excusing Defense Witnesses on Fifth Amendment Grounds?*

The defense produced at trial three witnesses, C. Jackson, the third man on the bus and car, G. Jackson, at whose apartment the alleged rapes and burglary took place, and Johnson who was identified as the man who committed the alleged third rape.

Since the kidnaping and rape counts may be retried, we shall briefly discuss the contention without deciding whether there was prejudice.

Each of the three defense witnesses named above was, before the defense attempted to put them on the witness stand, brought into the judge's chambers. There, in the presence of the court and counsel, G. Jackson and C. Jackson, without ever being sworn and having a question put to them, invoked the privilege against self-incrimination. After some discussion, the court sustained the invocation of the privilege. This procedure was erroneous.

As long ago as *Ex parte Stice* (1886) 70 Cal. 51 [11 P. 459] and as recently as *People* v. *Johnson* (1974) 39 Cal.App.3d 749 [114 Cal.Rptr. 545], it has been clear that before a claim of privilege can be sustained, the witness should be put under oath and the party calling him be permitted to begin his interrogation. Then, the witness may invoke his privilege with regard to the specific question and the court is in a position to make the decision as to whether the answer might tend to incriminate the witness.

We shall return to this issue in connection with Harris' robbery conviction.

As for Johnson, the issue is more confused. The same procedure was followed with respect to his testifying. Several times he changed his mind about invoking the privilege. So far as we can determine from the record, his last decision was not to invoke the privilege and thus to testify. However, he was neither called nor does any reason appear why he was not called as a witness before the jury.

With regard to Harris' robbery conviction while the procedure in excusing G. Jackson and C. Jackson was in error, we do not conceive the error to be prejudicial.

C. Jackson, the third male in the bus and the car, never reached the apartment where the alleged robbery took place. He was presumably a percipient witness to the events in the bus and to a degree of the events in the car. Thus, he might have corroborated the Baker-Harris testimony of those events and to that extent, corroborated appellants and thereby cast doubt on Dixon's credibility as a witness. But we do not know to what extent C. Jackson would have testified. No offer of proof was made.

With regard to G. Jackson who was in the apartment when the trio entered, on the basis of the testimony of appellants and Dixon, it is highly speculative that G. Jackson observed anything. Again, no offer of proof was made as to what he would testify.

Finally, we point out that while the proceeding by which the witnesses were excused was conducted erroneously, defense counsel never objected to the form of the procedure; never requested that the witnesses be sworn, never requested that he be permitted to question the witness, never requested that the witness be required to invoke his privilege against self-incrimination in response to the question, and never requested the trial judge to rule on the propriety of invoking the Fifth Amendment privilege in the context of a particular question.

In short, trial counsel had no objection to the procedure employed by the court and acquiesced in it.

## IV. *Should the Court Have Instructed,* Sua Sponte, *on Lesser Included Offenses With Respect to the Alleged Robbery?*

Harris contends that the court should have instructed on theft as a lesser included offense to robbery. That theft is a lesser included offense of robbery is not disputed.

The difficulty with appellants' position is that Dixon testified that Harris took the ring from her finger. Harris testified, as did Baker, that the ring was lost by Dixon betting against Baker and voluntarily surrendering the ring to Baker.

If the jury believed Dixon, there is substantial evidence to support the verdict of robbery. If the jury believed Harris and Baker, then Baker could be guilty of theft by fraud but there is nothing to indicate that Harris aided or abetted. By Harris' own testimony and by the testimony of Baker, Harris exercised no role in that transaction. But it was Harris, not Baker, who was charged with the robbery. Thus Harris was either guilty of robbery or he was guilty of nothing. In such a situation, a lesser included instruction should not be given. (*People* v. *Morrison* (1964) 228 Cal.App.2d 707 [39 Cal.Rptr. 874].) We observe, too, that trial counsel agreed that no lesser included instructions should be given in the case.

We conclude there was no error in the failure to instruct on lesser included offenses.

### V. *With Respect to the Robbery, Was It Error to Deny the Motions for a Mistrial Charge, Based on the Testimonial References to Polygraph and Lie Detector Tests?*

In the direct testimony of one of the detectives, the prosecution asked where he first saw the Dixon ring. His answer was "on my way from . . . where Mr. Baker had taken a polygraph examination." Subsequently, both defense counsel, in chambers, moved for a mistrial. It was denied without prejudice to renewing the motion at the end of the trial.

Later in the case, while appellant Harris was testifying on cross-examination, he was asked by the prosecution whether everything he had told the police during the investigation was true. Harris answered, "I told him [the detective] that I would take a lie detector test. I told him everything I knew which was the truth." Harris' trial counsel moved to strike the answer and later, in chambers, moved for a mistrial. Both motions were denied, the latter "without prejudice." These are the only mention of a polygraph or lie detector test in the nine days the case was tried before the jury.

The motions for mistrial were never renewed. At the conclusion of the evidentiary phase of the trial, Harris' counsel specifically did not wish the trial court to admonish the jury to disregard any reference in the testimony to lie detector tests.

"A motion for mistrial is addressed to the sound discretion of the trial court. It may properly be refused where the court is satisfied that no injustice has resulted or will result from the occurrences of which

complaint is made." (*People* v. *Ward* (1968) 266 Cal.App.2d 241, 249 [72 Cal.Rptr. 46].)

The testimony as to Baker having taken a polygraph test and Harris' volunteered statement that he was willing to take a lie detector test were, of course, as respondent concedes, inadmissible. But the two references were brief. Harris' volunteered statement, if anything, was helpful rather than prejudicial since it would tend to show that he believed he was telling the truth. The fact that Baker took a lie detector test (assuming the jury knew what a polygraph test was) might lead a jury to believe that Baker failed the test (otherwise why would the prosecution have brought him to trial) and therefore would tend to prejudice Harris. It would tend to prejudice Harris because if Baker was lying, Harris would have to be lying too, since their testimony was almost identical.

At the posture in the trial of the case when the errors took place, it cannot be said that the trial court abused its discretion in determining that no injustice would result therefrom. We point out again that in denying the motions for a mistrial, the trial court specifically stated that the denial was without prejudice to the right of counsel to renew the motion at the end of trial. Trial counsel, at the end of the trial, but before argument, though he discussed with the court the references to the lie detector tests, significantly did not renew his motion for a mistrial.

Accordingly, we hold that it was not error for the trial court to deny the motions for a mistrial.

### Conclusion

The judgment of conviction as to each appellant is reversed as to the kidnaping charge and as to each of the three rapes charged.

The judgment of conviction of appellant Harris on the charge of robbery is modified by striking therefrom the phrase "term to run concurrent" and, as so modified, the judgment is affirmed.

White, P. J., and Scott, J., concurred.

Petitions for a rehearing were denied June 15, 1979, and respondent's petition for a hearing by the Supreme Court was denied July 12, 1979.