STATE OF HAWAII, Plaintiff-Appellee, *v.* GEORGE TADASHI OSHIRO, Defendant-Appellant

NO. 9012

(CRIMINAL NO. 53178)

JANUARY 30, 1985

BURNS, C.J., HEEN AND TANAKA, JJ.

OPINION OF THE COURT BY TANAKA, J.

Defendant Dr. George Oshiro (Defendant), a dentist, appeals his conviction of raping a woman as she lay semiconscious under dosages of nitrous oxide in violation of Hawaii Revised Statutes (HRS) § 707-732, Rape in the Third Degree.[1] Defendant contends on appeal as follows: (1) that the victim was not mentally incapacitated or physically helpless under the statute; (2) that the statute is unconstitutionally vague and overbroad; (3) that newly discovered evidence entitled him to a new trial; and (4) that he had ineffective assistance of counsel. We find no merit in these contentions and affirm.

On January 26, 1979, Defendant hired the victim as a dental assistant. The victim had previous experience as a dental assistant in Korea but had never been exposed to nitrous oxide, also known as laughing gas, a general anesthetic often used in dental practice.

Her first day of work was the following Monday, January 29. The victim and Defendant spent most of the day cleaning up the office. During this time, Defendant spoke generally about sexual topics. The victim testified that since she did not consider sex a dirty topic, and that since Defendant only spoke about sex with willing women and not about his sex life or hers, she did not take the comments personally. He also showed her a gun that he kept in the office.

---

[1] At the time the offense occurred, HRS § 707-732 read:

Rape in the third degree. (1) A male commits the offense of rape in the third degree if he intentionally engages in sexual intercourse with a female who is mentally defective, mentally incapacitated, or physically helpless.

(2) Rape in the third degree is a class C felony.

This section was amended by Act 225, § 3, 1979 Haw. Sess. Laws 751, 752 and by Act 213, § 4, 1981 Haw. Sess. Laws 415, 416.

At 5:15 P. M., during working hours, Defendant asked the victim to try the nitrous oxide, so she could "explain . . . to the patients what it's like, what they might be feeling when they go under nitrous oxide." Transcript at 21. She lay down in the dental chair and he put the mask on.

While under the nitrous oxide, the victim felt disoriented, falling in and out of consciousness several times in what she described as a "dream sleep" state. She was woozy even when awake, experiencing a "slow kind of pulsation." Defendant touched various parts of her body, including one of her breasts, to determine, he said, if she was numb. She did not protest as "he's a doctor. I've never had reason to question a doctor before." Transcript at 125. He increased the dosage twice. The victim apparently was quite disoriented: she woke up and he was kissing her, passed out again, and then the next thing she remembered was his removing her pants. As he tried to insert his finger in her vagina, she managed to lift her hand and push him away. At no point did she touch him except to push his hand away from her vagina. However, she slipped into unconsciousness again. When she became fully conscious again he was engaged in intercourse with her. When he removed the mask, he told her that "they were going to get along just fine."

The victim lay there for a while, apparently to recover. Conscious of Defendant's gun, she told him only that she was ready to go home. Defendant let her out of the building. Once outside, she was still very woozy, walking to her car with difficulty. She also experienced trouble with driving: she could not stay in her own lane and blanked out for a moment, missing her freeway exit.

At the bench trial, Defendant's counsel focused his argument on the victim's consent to the gas and lack of overt non-consent to the sexual act. The trial court found, however, that at the time Defendant requested her to experience the gas he "had the intent to engage in sexual intercourse" with her. Transcript at 251. The court ruled that any consent which the victim might have given to the taking of nitrous oxide was obtained by Defendant through the use of deception. Therefore, it did not amount to consent. The court found Defendant guilty at the end of the trial on May 18, 1982, and sentenced him on December 3, 1982. This timely appeal followed.

I.

### a. Mental Incapacitation

Defendant contends that (1) his acts were merely "fraud in the inducement," which does not negate the victim's consent to take the gas;[2] (2) that consent to the intercourse occurred;[3] and (3) that deception does not negate the victim's consent to take the nitrous oxide where consent is an element of the offense. All three assertions lack merit but the third is worthy of analysis.

The term "mentally incapacitated" is defined in HRS § 707-700(13)[4] as the state of a person who is temporarily incapable of appraising or controlling his conduct due to a substance administered to him without his consent. Under HRS § 702-235(4) (1976) consent will not "constitute a *defense* if . . . [i]t is induced by . . . deception." (Emphasis added.) Defendant argues that the trial court incorrectly applied the consent statute to the mentally incapacitated statute, as the factor of consent in HRS § 707-700(13) is

---

[2] The traditional distinction between the two is that for fraud in the factum, the victim is tricked into doing act Y when he thought he was doing act X. For example, the victim thinks he signed his name to an autograph album, but in reality he signed a will. In fraud in the inducement, the victim is tricked into act X, and he did intend to do act X. For example, one who is induced to sign a will leaving out a dear friend when the named beneficiary deceitfully tells him he will take care of the friend.

Although this distinction is recognized in many jurisdictions, *see e.g., People v. Harris,* 93 Cal. App. 3d 103, 155 Cal. Rptr. 472 (1979), Hawaii is not one of them. HRS § 702-235 (1976) states that "consent does not constitute a defense if . . . [i]t is *induced* by deception." (Emphasis added.) Thus the Defendant's attempt to classify his conduct as fraud in the inducement is irrelevant, given our statutory scheme.

[3] Defendant perfunctorily claims that the victim consented to the act. However, this is irrelevant under a rape in the third degree charge. The statute merely states that a male commits the offense if he engages in intercourse with an incapacitated or helpless woman. No requirement of force or consent is mentioned. The statute thus implies that the fact of incapacitation or helplessness is an irrebuttable presumption of inability to give true consent. Not only is Defendant's contention unsupported by the evidence, but it is also immaterial.

[4] This section was originally numbered § 707-700(14) under Act 9, § 1, 1972 Haw. Sess. Laws 32, 86, and was so numbered at the time of the offense. A subsequent deletion dropped it to (13). The text of this subsection remains the same.

not a defense, but an element. Therefore, he contends, the trial court's finding that his deception negated the victim's consent is erroneous.

Our review of this legal issue is *de novo. See State v. Miller,* 4 Haw. App. 603, 671 P.2d 1037 (1983). It is true that consent here is an element so HRS § 702-235(4) is not directly applicable. However, both common law and common sense impel the logical conclusion that the denomination of consent as an element or a defense should not affect its basic nature. Extrinsic factors such as the burden of proof may change, but the essence of what constitutes consent does not. No other term in the legal lexicon is subject to such a dichotomy. Thus, if consent as a defense is subject to the ten qualifications of HRS § 702-235, then consent as an element is similarly restricted. We therefore agree with the trial court and hold that the deception did vitiate the victim's consent.

There is substantial evidence in the record, as required by *State v. Summers,* 62 Haw. 325, 614 P.2d 925 (1980), to show that the victim's ability to appraise her conduct was diminished and that her ability to control it was severely impaired. The evidence reflects a woman who slid in and out of consciousness, who had no memory of how her clothes were removed, who felt very detached and heavy-headed even when conscious. From such evidence, the reasonable inferences are that her ability to appraise her conduct was diminished, and that since she was physically helpless as discussed below, she was unable to control her conduct. Thus, the trial court's finding of mental incapacitation was proper.

### b. Physical Helplessness

The statute provides that a male commits rape in the third degree if he intentionally has sexual intercourse with a physically helpless female. Physical helplessness is defined in HRS § 707-700(14)[5] as unconsciousness or where a person is physically unable to communicate unwillingness.

The victim's uncontroverted testimony is that she was dis-

---

[5] This section was originally numbered § 707-700(15). *See* note 4, *supra,* for derivation. The text remains the same.

oriented, woozy, and felt "very very heavy" when awake during the administration of the nitrous oxide, and several times slipped into a state of unconsciousness. She passed out and woke to find the defendant kissing her, passed out again and then found him removing her pants, and passed out again and woke up to find him engaged in intercourse with her. At one point she did manage to push his hand away from her vagina, but then became disoriented and passed out again.

In a Florida case involving a similar statute, the court found that the victim had become physically helpless after the administration of nitrous oxide where the victim testified that he felt "heavy" and could not respond. *McIlwain v. State,* 402 So.2d 1194 (Fla. App. 1981). Similarly, there is substantial evidence in the record to support the trial court's finding that the victim was physically helpless. She was totally helpless during her periods of unconsciousness, and was so disoriented the rest of the time that she was physically unable to demonstrate her unwillingness. We hold that the trial court did not err in its finding.

II.

### Constitutional Law Claims

Defendant also argues that the statute under which he is charged is constitutionally invalid for vagueness and overbreadth. However, we do not reach this issue. Earlier in the case, on October 22, 1979, Defendant made a motion to dismiss the indictment. In it, he claimed these same grounds, as well as others. The trial court denied the motion, and Defendant was allowed an interlocutory appeal. The supreme court found no merit in Defendant's contentions and affirmed the trial court. *State v. Oshiro,* (No. 7724, October 23, 1981) (mem.).

When a court of superior jurisdiction has made a final decision on an area of law during the case, lower courts may not review the issue, as it has become the "law of the case." 1b J. Moore & J. Lucas, *Moore's Federal Practice* ¶ 0.404[1], (2d ed. 1984). This rule applies to the intermediate court of appeals on appeal from an earlier

supreme court decision. 5 Am. Jur. 2d *Appeal and Error* § 747 (1962).

Moreover, we note that the issue before this court is almost identical to the one presented to the supreme court, even to portions of the trial counsel's motion which are used verbatim on appeal. No new facts are alleged which require our examination. *See* 5 Am. Jur. 2d *Appeal & Error* § 748 (1962).

III.

Newly Discovered Evidence

Finally,[6] Defendant contends that the trial court erred in denying his motion for a new trial based on newly discovered evidence. He claims that five months after the trial, he found an expert who specializes in cases of this type who is prepared to testify that Defendant's machine could not have administered more than 70% nitrous oxide, which "will not anesthetize a fit subject." However, Defendant has failed to meet his burden of proof under the four-part test of *State v. Faulkner,* 1 Haw. App. 651, 624 P.2d 940 (1981). Defendant had to show that (1) the evidence was discovered after trial, (2) it could not have been discovered before or during trial through the exercise of due diligence, (3) it is material, and (4) it probably would change the result.

Substantively, the proffered testimony is immaterial. The question was not whether the victim was anesthetized, but only whether she was physically unable to communicate her unwillingness and mentally incapable of appraising her actions. While both of those would occur if the victim was totally anesthetized or unconscious, these reactions could also occur at a lower concentration of nitrous

---

[6] In the opening brief, Defendant states that if we find that the expert could have been discovered earlier, we should grant him a new trial due to ineffective assistance of counsel. However, no facts were cited to support this claim, and at oral argument, counsel stated that he didn't "really believe that it's ineffective, personally," and that "it's not unreasonable that the expert was not found." We find that Defendant not only failed to meet his burden of proof on this issue, but that he apparently abandoned the argument as well.

oxide. The prosecution's medical expert testified at trial that these disabilities would occur with a nitrous oxide concentration of between 10% and 50%. In this range, the victim would drift in and out of consciousness and be unable to respond appropriately. Thus no need exists for testimony about the maximum concentration of nitrous oxide that the machine could have administered.

Procedurally, Defendant also fails. He had to show both diligence in seeking the evidence and why it could not have been discovered in time for trial, which he did not do. Thus the trial court did not err in denying the motion.

Affirmed.

*Wayne D. Parsons* for defendant-appellant.

*Peter Van Name Esser, (Emlyn H. Higa* on the brief), Deputy Prosecuting Attorneys, for plaintiff-appellee.