Filed 12/31/14  In re An. M. CA2/8

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| In re An.M. et al., Persons Coming Under the Juvenile Court Law. | B256924 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>R.M.,<br><br>        Defendant and Appellant. | (Los Angeles County Super. Ct. No. DK00667) |

        APPEAL from orders of the Superior Court for the County of Los Angeles. D. Zeke Zeidler, Judge.  Affirmed.

        Jack A. Love, under appointment by the Court of Appeal, for Defendant and Appellant.

        Richard D. Weiss, Acting County Counsel, Dawyn R. Harrison, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

_____

## SUMMARY

The father in this dependency case appeals the juvenile court's jurisdictional and dispositional orders. He argues the court did not follow proper procedure when his lawyer informed the court father would invoke his Fifth Amendment privilege against self-incrimination, and claims the court improperly imposed an evidentiary sanction for his invocation of the privilege. Father also contends substantial evidence did not support the jurisdictional findings and that his children should have been returned to his custody. We affirm the orders.

## FACTS

Father's two daughters, An.M. (then nine years old) and Ab.M. (then five years old) came to the attention of the Los Angeles County Department of Children and Family Services (the Department) after father physically assaulted C.W., their 86-year-old paternal great-grandmother, in August 2013. The children were detained from father, and remained in the care of their mother. Father was arrested.

The juvenile court ultimately sustained the allegation that father had "a history of engaging in violent altercations," and that on August 16, 2013, "the father dragged the paternal great grandmother, [C.W.] by her arm and violently threw [her] in a bathtub and sprayed water on [her] face and body causing [her] to have difficulty in breathing. [C.W.] sustained multiple bruises to [her] body. On a prior occasion, the father pushed [her]. Such violent conduct on the part of the father against [C.W.] and previous violent altercations with the mother endanger the children's physical health and safety and place the children at risk of physical harm and damage."

By way of background, the parents were married in 2003. Father was in the Army for 20 years, and returned from Bosnia in early 2004, just before An.M. was born. When he returned "there was a lot of stress" and "the arguments started." Mother related three incidents of physical assaults. In the first, father "pushed [her] on the bed and started punching [her]"; in the second, he "kicked [mother] really hard on [her] chest while sitting down and punched [her] in front of his grandma," and "[An.M.] was there too." Mother was "moving in and out" of their home because of their arguments. In the third

2

incident in April 2007, with An.M. and C.W. also present, father "started banging [mother's] head on the chair," and "had me in a headlock and swooped my foot and fell down and he kinda fell on top of me and I heard my ankle snap." Mother did not report the incident initially, but moved out in June 2007, when she "saw his same reaction in an argument like back in April."

In August 2007, mother filed for divorce and a restraining order. The divorce was never finalized and the restraining order was denied for lack of evidence. (Father's grandmother denied the domestic violence.) In the family court proceedings, in December 2007, mother was given 70 percent custody and father was given 30 percent custody. The parents remained separated, with father (who lived with his grandmother) having the children every other weekend and on Wednesdays. About a year and a half before these proceedings began, father began to pick up the children from school and take them to his home, and the mother would then pick them up after work.

According to the police report of the assault on C.W., father told C.W. that if she told anyone, father would kill them, and also that he "would kill everyone including the police."

After the assault, the children were detained. In addition to the allegations concerning the assault on C.W., the Department's dependency petition alleged that the mother and father had a history of engaging in violent altercations, and described the assault in 2007 that resulted in the mother sustaining a broken ankle in An.M.'s presence.

Mother told the social worker that the girls "have disclosed that they are scared of father and that they do not know why their dad is mad at them sometimes." Mother said "that the girls have admitted to 'peeing' on themselves because father begins to question them if they use the restroom more than a couple of times." Mother also said "that she does feel scared for the children as father does lose his temper often and mother has witnessed father push [C.W.] previously and feels that father is more of a danger to [himself than] to anyone else." In a later telephone call with the social worker, mother said "that she is sometimes scared and feels that the girls are in danger due to father's

3

temper in specific situations. Mother stated that father is paranoid and is not mentally stable. Mother feels as if father needs a psychological evaluation."

The party who reported the abuse of C.W. told the social worker that C.W. "had many bruises all over her body" and was traumatized by the incident. The reporting party said C.W. "did not disclose any physical abuse of the children but mentioned that the children had scared looks on their faces and sometimes urinate on themselves when father would call for them in the home."

The maternal grandmother said that the parents had domestic violence in their relationship, but she had never heard of father abusing the children or C.W. She had never seen the children with any unusual marks or bruises, and said that father "takes good care of the girls" and "would not hurt the girls as father has too much love for the girls."

When asked how her parents got along, the older daughter, An.M., told the social worker, "Not good. I always say not good because they would always argue. Every time my mom would come to his house they'd argue. He just gets [mad] really easy." She remembered the 2007 incident "when I was really small when [Ab.M.] wasn't born my dad really hurt my mom." An.M. "wasn't there when my dad hit my grandma. I heard [about] it. If my dad, if anything happens he wouldn't want me to see. He'd tell me to stay in the room or take me to the bathroom. . . . [S]ometimes he'd tell grandma to do something. If he got mad then he'll go to her chair and put his arm on the chair and he'd speak in front of her face. He would be very mad. He'd be yelling at my grandma."

An.M. said that, except for the 2007 incident, she did not see any other incidents of domestic violence "other than mother and father always arguing." Nor did she ever see her father physically hit or hurt her grandmother. An.M. said, "I feel sad that he's gone 'cause I miss him. I want to see him but I don't because I think he's going to come back the same, mean; how he scares me with his loud voice. He has a very loud voice." She denied peeing in her pants.

The younger daughter said she did not witness any physical violence between her parents, but that they argued. She also said her father and grandmother argue, but she

4

never saw her father hurt her grandmother or anyone else.  She said she "is not scared of her father and feels safe with father"; she said "that father does yell at her but she is not scared when he yells."  She admitted sometimes peeing in her pants "due to not wanting to stop playing" but denied she did so because she was afraid of father.

Two months after the assault, a social worker interviewed C.W. at the convalescent home where she was recovering from the injuries father inflicted.  C.W., "a small, frail, elderly woman," was "very emotional" throughout the interview.  She was "glad to hear that the Department was investigating this matter for [the children's] sake."  She said:  "I was thrilled the children weren't home . . . when he went crazy.  He truly went crazy all of a sudden.  I had just left him in the living room and gone to my bedroom to get my clothes to shower.  He walked in with his arms crossed and he didn't say nothing.  He just stood there; just standing there. . . .  I've been telling him to get a psychiatrist . . . .  You can't make a man see a psychiatrist, a doctor.  They got to do it on their own, but I still love him.  He's my grandson, but I don't think he knows what he did.  He took me to the doctors after he beat the shit out of me.  I was almost dead when I got there."

C.W. related that father had dragged her into the bathroom, and her head hit the door frame.  After he threw her in the bathtub, father had the shower hose in his hand and tried "to put the water in my nose like he was trying to drown me."  Then he picked her up "like if I was a potato chip," put her in the walker, brought her to his car, "and picked me up and threw me in his car. . . .  I don't know.  He was looking for a place to kill me."  Finally he brought her to the hospital.  "I was in bad shape when I came in, but I still love him.  He's my grandson, but I don't think he [knew] what he was doing.  I can't walk.  They're teaching me how to walk again.  It could've been worse if he would've killed me."

C.W. said that father argued a lot with her, and "[h]e'd try to take it out on me; what the soldiers did to him.  You know he fell off a big army truck.  He was hurting so bad."  C.W. said she had never seen father abuse or mistreat the children:  "Not

5

physically hit them. He wouldn't allow me to talk bad in front of them. [Father] loves those babies. That's one thing, he did love his children. I'm happy we're all alive."

At the time of the combined jurisdictional and dispositional hearing on April 8, 2014, the children were doing well and no longer appeared to need therapy. Father had had his first monitored visit with the children on January 8, 2014, and visits were taking place weekly, with father and children appearing happy and affectionate throughout the visits. Father's jury trial in his criminal case was scheduled for April 28, 2014.

At the hearing, the juvenile court admitted the Department's various reports into evidence. Father did not submit any documentary evidence, and his counsel told the court that father's criminal attorney advised father not to testify in the dependency proceedings. The juvenile court stated: "So had he been called to testify, he would have invoked his Fifth Amendment rights?" and counsel responded, "I believe so, Your Honor."

The court then observed that, because of the lack of documentary evidence or witnesses from father, the court needed waivers, "and I need to be able to question him about his understanding of that decision not to call witnesses or submit any evidence." The court then recessed the case "for written waivers from father's counsel indicating that he's submitting on the social worker's documents."

No waiver of rights appears in the record. When the parties reconvened, the Department asked to reopen, indicating that the Department "would be calling the father to testify rather than just using the reports." The court asked father's counsel: "[Y]ou're indicating that, if the father were called and duly sworn, he would be asserting his Fifth Amendment rights to not answer any questions?" Counsel replied: "Well – yes, Your Honor," but asked the court to put the case over until father's criminal case was completed. When the court refused that request, this colloquy occurred:

"[COUNSEL]: Well, Your Honor, I believe my client would assert his Fifth Amendment rights because he does not want to incriminate or prejudice himself, given the pending criminal trial.

6

"THE COURT: So rather than go through the whole exercise of having him sworn and questions asked, we're going to proceed with the understanding that had he been called, he would have invoked his Fifth Amendment rights. Of course, in dependency cases, unlike criminal cases, the refusal to testify can be used against him."

The court then asked the Department if it had any additional evidence or witnesses (it did not), and said: "So the minute order will reflect that [the Department's counsel] asked to call the father as a witness, and the father invoked his Fifth Amendment rights."

Father's counsel then argued the petition should be dismissed, and counsel for mother and the children asked the court to sustain the petition. After observing that the petition was filed only because of the incident with C.W., during which the children were not present, the court asked the Department's counsel, "So what's the nexus, [counsel]?" The Department pointed out the evidence showed that the mother had covered up her broken ankle in 2007; that the father was very controlling; that his grandmother "talks about how volatile [father] is . . . and how she was grateful that [she] and the rest of her family were still alive, given what was going on with father"; that the older child described how the father would be "very mad" and yell at C.W.; and that he almost killed his grandmother. Counsel concluded that "he's not controlling his anger" and "be it with the mother, with the children, with the grandmother, with anybody around him, I think he poses a risk to these children, Your Honor."

The court dismissed the allegations concerning domestic violence against mother that dated back to 2007, but sustained the allegation relating to the assault on C.W., amending it "to conform to proof," adding that father's violent conduct "against the PGGM and previous violent altercations with the mother" placed the children at risk of physical harm and damage.

Father's counsel asked that the children be placed "home of parents, that my client be allowed unmonitored visits," and if there were concerns, "that his visits be in a public setting, or something of that nature . . . ."

The court found that remaining in the home of the father "would pose substantial danger to the children's physical health, safety, protection, or physical or emotional well-

7

being," and there were no reasonable means other than removal to protect the children. The court ordered the children were to be placed with mother. Among other things, the court ordered monitored visits for father in a neutral setting at least twice a week; mother was not to be the monitor, and father was not to visit in the mother's home. The court also ordered father to attend and complete a domestic violence anger management, 52-week certified batterer intervention program, parenting education, and individual counseling, and ordered a psychological assessment and psychiatric evaluation.

Father filed a timely notice of appeal.

## DISCUSSION

### 1. The Fifth Amendment Claim

Father contends there was "constitutional error" in the procedure the court used when he invoked his Fifth Amendment privilege. He argues the court erred by not placing him under oath, permitting him to be questioned, and ruling on his invocation of the privilege in response to specific questions. He also contends the juvenile court "improperly imposed an evidentiary sanction" when he invoked his Fifth Amendment privilege, and further contends that he did not forfeit these claims by failing to object because any objection would have been futile.

As explained more fully below, we reject father's claims. First, we agree with respondent that father forfeited this claim. He made no objection to the juvenile court's procedure, which provided the very result father sought: the right to not testify. Father says an objection would have been futile, but he makes no showing to support that claim. Second, even if the claim had not been forfeited, and even if there had been error (which we expressly do not find), father has not demonstrated prejudice.

Father correctly points out the rule stated in *People v. Harris* (1979) 93 Cal.App.3d 103, 117 (*Harris*): "[B]efore a claim of privilege can be sustained, the witness should be put under oath and the party calling him be permitted to begin his interrogation. Then, the witness may invoke his privilege with regard to the specific question and the court is in a position to make the decision as to whether the answer

8

might tend to incriminate the witness." That did not happen here. But the error, if any, favored father who, as desired, was not compelled to testify.

Moreover, in *Harris*, the court pointed out that (as here) counsel failed to object. In finding no prejudice, the *Harris* court said: "Finally, we point out that while the proceeding by which the witnesses were excused [from testifying based on Fifth Amendment privilege] was conducted erroneously, defense counsel never objected to the form of the procedure; never requested that the witnesses be sworn, never requested that he be permitted to question the witness, never requested that the witness be required to invoke his privilege against self-incrimination in response to the question, and never requested the trial judge to rule on the propriety of invoking the Fifth Amendment privilege in the context of a particular question. [¶] In short, trial counsel had no objection to the procedure employed by the court and acquiesced in it." (*Harris, supra,* 93 Cal.App.3d at p. 118.) The same is true here.

Finally, father insists that the trial court "improperly imposed an evidentiary sanction" when he invoked his Fifth Amendment privilege, because the court observed: "Of course, in dependency cases, unlike criminal cases, the refusal to testify can be used against him." While counsel voiced no concern at the time, on appeal father says there was a "reasonable likelihood" that the juvenile court "considered father's refusal to testify as a factor in sustaining the allegations in the petition," and a "reasonable probability the juvenile court's reliance on father's refusal to testify tipped the scales of justice against father . . . ."

When a parent chooses not to testify, the consequences "must be limited to the usual consequences occasioned by the lack of cooperation in the reunification process, or by the failure to present evidence." (*In re Mark A.* (2007) 156 Cal.App.4th 1124, 1142, 1129 [juvenile court erred in imposing an evidence sanction by striking the testimony of other witnesses after the father invoked his Fifth Amendment right, but the error was not prejudicial].) In this case, we see no basis for inferring that the court's words meant anything more than that father's failure to present contrary evidence would operate to his detriment, because the court would decide the matter based only on the Department's

9

evidence. Father points to nothing in the hearing transcript to suggest the juvenile court used father's refusal to testify as a factor in its decision, and the record belies any such reliance.

The court received all the Department's reports in evidence. After father invoked the Fifth Amendment, the court solicited "[a]ny other documentary evidence or witnesses from any other counsel," and then entertained argument. The court questioned counsel for father about the nexus between the remote-in-time allegations of domestic violence with mother and the children "being so afraid" of father and "not even knowing why he's yelling at them." The court discussed the different versions of the reasons for the children urinating on themselves. The court inquired about the mother's position on "the nexus issues." The court questioned counsel for the Department about the fact that only the assault on the paternal great-grandmother brought the children into the dependency system, and about the fact there was no information that father ever physically lashed out at the children. After argument, the court stated that it had "read and considered the evidence, listened to and considered the testimony." And finally, the court dismissed the allegations involving domestic violence with the mother, and amended the count involving the violent conduct against C.W. "to conform to proof."

In short, the record makes it plain that the juvenile court decided the case based on the evidence presented. Although the court's statement that "the refusal to testify can be used against [father]" was problematic, there is nothing to suggest an "evidentiary sanction" was imposed.

2. **The Substantial Evidence Claims**

a. **The jurisdictional order**

Father contends there was no showing his children were at risk of suffering serious physical harm as required under Welfare and Institutions Code section 300, subdivision (b).[1]

---

[1] All further statutory references are to the Welfare and Institutions Code.

10

" 'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." [Citation.]' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.) "The ultimate test is whether a reasonable trier of fact would make the challenged ruling considering the whole record." (*In re James R.* (2009) 176 Cal.App.4th 129, 135.)

Jurisdiction is proper if there is a substantial risk the children will suffer "serious physical harm or illness" as a result of father's failure to adequately protect them. (§ 300, subd. (b).) This jurisdictional requirement " 'effectively requires a showing that at the time of the jurisdictional hearing the child is at substantial risk of serious physical harm in the future . . . .' [Citation.]" (*In re James R., supra,* 176 Cal.App.4th at p. 135.)

The Supreme Court tells us that "section 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction." (*In re I.J., supra,* 56 Cal.4th at p. 773.) "The legislatively declared purpose . . . 'is . . . to ensure the safety, protection, and physical and emotional well-being of children *who are at risk of that harm*.' (§ 300.2, italics added.) 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" ( *Ibid*.)

Father argues that the incident with his grandmother did not place the children at substantial risk of serious physical harm, citing the evidence that father loved his children, did not use physical discipline or otherwise abuse them, and the children had never seen any physical altercations resulting from the yelling between the parents and between father and his grandmother. We do not agree with father's view.

While the children did not actually witness father's horrendous assault on his 86-year-old grandmother, it is reasonable to infer that fortunate fact was merely happenstance. The assault took place for no apparent reason, and on other occasions the

11

children witnessed the father yelling at C.W.; he "would be very mad" and "yelling at my grandma." An.M. stated that "[h]e just gets [mad] really easy," and remembered the 2007 incident when "my dad really hurt my mom." While mother confirmed father had not ever physically hurt the girls, she "realized how easily he snapped." Mother said "she is sometimes scared and feels that the girls are in danger due to father's temper in specific situations." Mother also said the girls "have disclosed that they are scared of father" and "do not know why their dad is mad at them sometimes."

In short, the evidence supported the juvenile court's finding of a substantial risk of serious physical harm to the children. "[D]omestic violence in the same household where children are living . . . is a failure to protect [the children] from the substantial risk of encountering the violence and suffering serious physical harm or illness from it." (*In re Heather A*. (1996) 52 Cal.App.4th 183, 194.) "Children can be 'put in a position of physical danger from [spousal] violence' because, 'for example, they could wander into the room where it was occurring and be accidentally hit by a thrown object, by a fist, arm, foot or leg . . . .' " (*In re E.B.* (2010) 184 Cal.App.4th 568, 576, quoting *In re Heather A., supra,* at p. 194; cf. *In re Eric B.* (1987) 189 Cal.App.3d 996, 1003 ["Reasonable apprehension stands as an accepted basis for the exercise of state power."].)

The purpose of dependency proceedings "is to prevent risk, not ignore it." (*In re Eric B.*, *supra,* 189 Cal.App.3d at p. 1004.) The juvenile court did not err in this case.

### b. The dispositional order

Father also challenges the sufficiency of the evidence to support the court's dispositional order.

Under section 361, a dependent child "may not be taken from the physical custody of his or her parents . . . unless the juvenile court finds clear and convincing evidence of any of the following circumstances . . . : [¶] . . . There is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (*Id*., subd. (c)(1).)

12

" 'A removal order is proper if based on proof of parental inability to provide proper care for the child and proof of a potential detriment to the child if he or she remains with the parent. [Citation.] "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." [Citation.]' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247.) " 'There must be clear and convincing evidence that removal is the only way to protect the child.' [Citation.]" (*Ibid.*) We review the court's dispositional order for substantial evidence. (*In re R.V.* (2012) 208 Cal.App.4th 837, 849.)

As with the jurisdictional finding, the evidence we have already described at length amply supports the dispositional finding.

Father insists there were "reasonable means" by which the children's physical health could be protected without removing them from his custody. (§ 361, subd. (c)(1).) He suggests this could be accomplished by requiring him not to interact with mother (dropping off the children without going to the door so there would be no arguments, or meeting mother "at a neutral location"). Father also points out there was already an order that he have no contact with his grandmother, and he was "willing to participate in programs, such as parenting and counseling."

We fail to see how these could be viewed as reasonable means to protect the children in the circumstances of this case. As respondent points out, father simply "ignores the severity of his own violence and lack of control over seemingly insignificant occurrences." Father's attack on his grandmother was shocking and demonstrated a terrifying inability to control his anger. The violent altercations with mother while they lived together similarly demonstrated lack of control. As the court said in *In re I.J.* (albeit in the context of sexual abuse), " '[s]ome risks may be substantial even if they carry a low degree of probability because the magnitude of the harm is potentially great.' " (*In re I.J., supra,* 56 Cal.4th at p. 778.) The same is true here. We find no error in the juvenile court's conclusion that removal was the only reasonable means to protect the children.

13

## DISPOSITION

The orders are affirmed.

GRIMES, J.

We concur:

BIGELOW, P. J.

RUBIN, J.