Filed 1/30/24

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| THE PEOPLE, | D080776 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCE407393) |
| ADRIAN LAMONT BROOKS, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Frank L. Birchak, Judge. Affirmed.

Christine M. Aros, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Arlene A. Sevidal and James M. Toohey, Deputy Attorneys General, for Plaintiff and Respondent.

INTRODUCTION

A jury found Adrian Lamont Brooks guilty of both inflicting corporal injury on a domestic partner, R.J., and committing assault by means likely to

produce great bodily injury.  Brooks raises two arguments on appeal:  (1) the trial court erred in instructing the jury that R.J. had exercised the privilege against self-incrimination because she never personally invoked it after being called and sworn, and thus she was not legally unavailable to testify; and (2) the trial court abused its discretion in failing to replace an allegedly biased juror.

We disagree.  We conclude R.J. asserted a valid Fifth Amendment privilege through counsel, making the related jury instruction proper.  We further conclude the trial court's decision not to excuse the challenged juror was supported by substantial evidence the juror was not biased.  We thus affirm.

BACKGROUND

I.

The evening of July 1, 2021, Brooks and his on-and-off partner, R.J., got into an altercation at a gas station.  After law enforcement reported to the scene and investigated, the officers found probable cause to arrest Brooks.

Brooks was charged with inflicting corporal injury on a domestic partner (Pen. Code, § 273.5, subd. (a); count 1) and committing assault by means likely to produce great bodily injury (§ 245, subd. (a)(4); count 2.)

II.

At trial, two eyewitnesses and several first responders testified about Brooks and R.J.'s fight.

D.H., who lived in an apartment building across the street from the gas station, awoke to R.J. "screaming . . . at the top of her lungs."  From her door, D.H. saw Brooks pull R.J. out of a van.  She also observed him "stomping on [R.J.] and punching her."

2

D.H. called 9-1-1. She thought R.J. "was trying to resist" and looked fearful as she shouted for help. D.H. then saw her neighbor, A.A., run to "try[ ] to separate them."

A.A. heard yelling at the gas station and D.H. calling 9-1-1. She heard D.H. say (1) a man was choking a woman who was going to die but (2) she was too scared to get involved, prompting A.A. to run outside. A.A. "saw a man beating up this woman[,] . . . on top of her [and] strangling her," so A.A. pushed him. Brooks tried to get in his van and leave, but R.J. would not let him, so they continued to fight physically. Brooks inadvertently hit A.A. Eventually, A.A. tore off Brooks' shirt to reseparate him from R.J.

Police officers and a paramedic responding to the scene found R.J. upset and disoriented. According to the paramedic, R.J. had injuries consistent with "significant blunt force trauma." According to an officer, Brooks had scratches on his face consistent with defensive wounds.

III.

R.J. did not testify at trial. Brooks, however, testified on his own behalf, and his version of events differed from that of the other witnesses.

According to Brooks, after he and R.J. spent several hours drinking at a party, they went to a bowling alley to meet friends. R.J. refused to go to the bathroom there, so Brooks offered to drive to a gas station where she could use the restroom. On the way, R.J. urinated in a bucket, which spilled in Brooks' van. Brooks got napkins from the gas station attendant so R.J. could clean the mess.

When Brooks returned to the van, R.J. was using her dress to wipe up the urine, so Brooks grabbed for the dress and tried to hand her the napkins. R.J., however, pulled her dress back, which caused a buckle on it to hit her in the face. Brooks laughed, and R.J., who was angry, picked up an ashtray and

3

hit him on the head. Brooks and R.J. began arguing, and R.J., who was in the van, tripped and fell out the door. Brooks caught her before she fell but landed on top of her. The van's door compartment broke, and Brooks' belongings fell on the ground.

Brooks testified that he helped R.J. up and told her he was going to leave her there, as he was angry. He previously had been jailed for altercations with R.J., so he wanted to leave before the police arrived. R.J. yelled for her belongings, and Brooks screamed to let him leave. R.J. got angry and grabbed Brooks' shirt, and they started "tussling." A.A. ran over and told R.J. to let go of Brooks. According to Brooks, R.J. then hit A.A.

Once Brooks got away and began picking up his things, the police arrived. He refused to go with them until he had collected his belongings, but the police jumped on him and choked him until he was unconscious.

Brooks denied stomping on or attempting to strangle R.J. He said the two eyewitnesses "told a bunch of lies" and "missaw" the events.

## IV.

After deliberating fewer than two hours, a jury found Brooks guilty of both charged counts.

## ANALYSIS

Brooks argues the trial court reversibly erred in two ways. First, he contends R.J. did not legally assert her Fifth Amendment privilege against self-incrimination because she was never called and sworn, and so the court erred in instructing the jury that the privilege applied, thereby preventing defense counsel from arguing an adverse inference from her refusal to testify. Second, he claims the trial court abused its discretion in refusing to excuse an allegedly biased juror, thus violating Brooks' right to an impartial jury. We address each claim in turn.

4

## I.

We review Brooks' claim of instructional error de novo. (*People v. Guiuan* (1998) 18 Cal.4th 558, 569.)

## A.

Brooks' challenge to the jury instruction stems from the trial court's ruling that R.J. was unavailable because she invoked her Fifth Amendment right against self-incrimination.

### 1.

In an unreported pretrial conference, the court and counsel discussed how R.J. likely had a Fifth Amendment privilege not to testify. The court requested R.J. be provided counsel for that reason.

R.J.'s appointed counsel appeared at a subsequent pretrial hearing, at which he confirmed that his "client would likely be asserting her 5th Amendment privilege, absent any grant of immunity." The prosecutor opined that, because R.J. recently pled guilty to a charge, she no longer enjoyed a Fifth Amendment privilege.

The court found a colorable Fifth Amendment privilege despite R.J.'s recent plea agreement. Because the defense intended to question R.J. about hitting Brooks with the ashtray, which was "very relevant to the central issue in this case," the court said it "easily sees an answer of, yes, I hit him with an ashtray as incriminatory. I don't think it gets much more incriminatory." Even if the plea addressed that conduct, the court noted it was "not yet final," so "[R.J.] would still have a 5th Amendment right." R.J.'s counsel confirmed R.J. "would be asserting . . . the Fifth to that line of questioning."

The court noted if the People granted immunity, "[R.J.] would be ordered to testify as to those subjects." But R.J.'s counsel opined any immunity "would have to be pretty far reaching and go beyond simply an

5

immunity from assault." He indicated "something that would address substance-related conduct" "would be another necessary element," given a pending case against R.J. for driving under the influence. As "the facts of this case are going to show [R.J.] was urinating in a bucket in the car[,] . . . the court might be able to draw some inferences about her mental state." R.J.'s counsel further noted "she had several prior domestic violence related convictions" and a pending dependency case, so he "want[ed] to make sure she is protected about violating any pretrial orders" in that matter.

Based on that information, the court found "there is likely [a] sufficient showing . . . to assert [a] 5th Amendment privilege . . . on assaultive conduct that night, and . . . a broad range of abuse of substances or under the influence of alcohol conduct." The prosecutor asked the court to reserve ruling so she could discuss the immunity issue with her supervisor. The court agreed, saying it was "just raising the issues of . . . what [it] think[s] the court would be likely [to] find there would be privilege to, so that . . . everybody's on the same page of what immunity would be necessary in order to have [R.J.] testify."

2.

The first day of trial, the prosecutor said she was not offering R.J. immunity. Defense counsel asked the court to grant derivative use immunity, but the court denied the request as outside its "discretion or authority." The prosecutor clarified that her office may reconsider an immunity offer if "[she] could not prove the case unless [R.J.] took the stand."

During a conference the second day of trial, defense counsel said it was "clear the prosecution does not intend to call [R.J.]," which she believed raised evidentiary concerns "since [R.J.] is not unavailable." The court disagreed, finding "[s]he is unavailable. She's asserted her Fifth Amendment

6

privilege, which makes her unavailable." Defense counsel acknowledged this privilege without objecting to the way R.J. asserted it. Instead, defense counsel focused on immunity, insisting "the prosecution can make [R.J.] available by offering immunity." The court replied that the prosecution was not obligated to offer immunity and that refusing to offer immunity "does not make [R.J.] . . . available."

The third day of trial, defense counsel asked to call R.J. to testify to nonprivileged issues so the jury could assess some of the physical evidence the People relied on to show Brooks choked R.J. The court said it was "leaning towards . . . allowing [the defense] to call [R.J.]" for that limited purpose but cautioned there are "always tradeoffs." For example, if R.J. testified, the court would allow the People to present certain body-worn camera footage. The court also likely would allow the People's domestic violence expert to testify, because R.J.'s testimony would "trigger[ ] issues related to her demeanor and attitude on the stand."

That afternoon, defense counsel still planned to call R.J. to testify. Should R.J. assert her Fifth Amendment privilege on the stand, the court was inclined to instruct the jury with CALCRIM No. 320 (exercise of privilege by a witness). The court reiterated it had already "found that there are components, things, that might not incriminate [R.J.] but a lot of things potentially that would." While it may need to conduct a further hearing "about other areas" of questioning to assess "whether or not she has a privilege to those" topics, as for the topics already discussed, R.J. "has a right to a privilege and [the court] do[es not] need additional testimony about that." To the extent R.J. chose "to answer certain incriminating questions," the court would treat those responses "as a waiver of the Fifth Amendment privilege."

7

The fourth day of trial, after speaking with her client and R.J.'s counsel, defense counsel decided not to call R.J. The trial court then excused R.J., who was present.

Later that day, after the defense rested, the court and counsel discussed the possibility of instructing the jury "along the lines of" CALCRIM No. 320. The prosecutor requested that type of instruction so the jury would not "speculate" about R.J.'s failure to testify. Defense counsel asked the court not to so instruct because "[t]here was no privilege [¶] . . . [¶] [e]xercised in front of the jury," so such an instruction "would be misleading and confusing."

The court "lean[ed] towards" finding CALCRIM No. 300 "sufficient to cover th[e privilege] issue," as it instructs that neither side is obligated to call all witnesses who are, or produce all evidence that is, potentially relevant. But the prosecutor objected because failing to call the victim in a domestic violence case would "look[ like] a failure by the People."

In the end, the court concluded that because R.J. asserted the privilege and the law prohibits the jury from drawing any inference from her failure to testify, the court "need[ed] to tell them in some fashion that that is the state of the law," even if the instruction "doesn't address the reason why." In response, *defense counsel* asked if the court would "consider telling the[ jury] that [R.J.] invoked her right against self-incrimination." When the court agreed, defense counsel indicated she was "happy." The court proposed language and twice elicited agreement from both counsel that the instruction was acceptable.

The given instruction read: "A witness may refuse to answer questions, or testify, if it calls for privileged information. [R.J.] asserted her privilege against self-incrimination. Under the law, [R.J.] was justified in refusing to testify. Do not consider her refusal to testify for any reason at all and do not

8

guess what her testimony would have been." The instruction was substantively identical to what the parties discussed earlier that day.

B.

Brooks' claim of instructional error depends entirely on his view that "there was no privilege asserted" because "[R.J.] was never called to the stand[ and] never sworn." It is only for that reason he claims that "instruct[ing] the jury '[R.J.] asserted her privilege against self-incrimination'" was "factually incorrect" and thus in error.

California codified the federal constitutional right not to incriminate oneself as a statutory privilege that we construe liberally. (U.S. Const., 5th Amend.; Cal. Const., art. I, § 15; Evid. Code, § 940; *People v. Capers* (2019) 7 Cal.5th 989, 1010.) We review de novo a trial court's finding that a witness has a Fifth Amendment privilege. (*People v. Seijas* (2005) 36 Cal.4th 291, 304 (*Seijas*).) For purposes of this opinion, we assume the same standard applies to determine if a witness effectively exercised the privilege.

1.

Brooks argues R.J. did not actually exercise her privilege against self-incrimination. He claims the privilege can be asserted only by the holder personally on a question-by-question basis after being called and sworn. Because R.J. never invoked the privilege in that manner, Brooks argues "the court was not in a position to determine whether [she] could exercise the privilege." The People contend R.J. validly asserted the privilege under the circumstances of this case and the court "possessed sufficient information to determine whether the invocation was valid." We agree with the People.

a.

Thirty-five years ago, our Supreme Court stated: (1) the privilege against self-incrimination is "personal and may be asserted only by the

9

holder," and (2) to assert it, "a witness must not only be called but must also be sworn." (*People v. Ford* (1988) 45 Cal.3d 431, 439-440 (*Ford*).) Those seemingly definitive statements, however, must be considered in their fact-specific context.

In *Ford*, defense counsel speculated that two codefendant witnesses— who he did not represent—"*might* claim the privilege if called" to testify. (*Ford*, *supra*, 45 Cal.3d at p. 440, italics added.) Although the codefendants were never called as witnesses and never asserted any Fifth Amendment privilege, defense counsel argued that, in a criminal trial, any witness who is or has been a codefendant and who conceivably could exercise the privilege should be deemed "'unavailable'" as if he or she had in fact asserted a privilege. (*Ford*, at p. 439.) Our Supreme Court rejected that argument because the privilege is personal, so "a codefendant[ ] or other witness" cannot assert the privilege on another's behalf. (*Ibid.*) Moreover, the trial court never spoke with the witnesses or their counsel, so it never had the chance to explore if questioning would be incriminating or if the witnesses would waive any privilege. That factual situation informed the Supreme Court's holding that a witness must be called and sworn. (*Id.* at pp. 440-442.)

Our Supreme Court later summarized this holding to clarify that, "[t]o be found unavailable on this ground, a witness must not only intend to assert the privilege, but also be entitled to assert it." (*People v. Cudjo* (1993) 6 Cal.4th 585, 616 (*Cudjo*), citing *Ford*, *supra*, 45 Cal.3d at pp. 440-441.) A subsequent decision shows flexibility in how a witness may validly assert his or her privilege against self-incrimination so long as the trial judge has the information necessary to assess the existence of the privilege.

For example, under the right circumstances, counsel may assert the privilege on behalf of his or her client. In *People v. Apodaca* (1993)

10

16 Cal.App.4th 1706, 1713, 1716 (*Apodaca*), the trial court appointed counsel to advise a witness of her Fifth Amendment rights and ordered the witness to testify "to determine if she would invoke the privilege." During a hearing, the witness was sworn and testified about some matters. (*Id.* at p. 1716.) When asked a potentially incriminating question, her counsel interjected "'to assert The Fifth.'" (*Id.* at p. 1713.) The trial court found the witness had a valid privilege, and defense counsel agreed. (*Id.* at pp. 1713-1714.)

On appeal, the defendant, relying on *Ford*, argued the witness did not properly invoke the privilege against self-incrimination because her attorney, rather than the witness herself, invoked the privilege. (*Apodaca, supra,* 16 Cal.App.4th at p. 1714.) This district, however, rejected that argument. Although "*generally* a witness must first be placed under oath, take the stand[,] and actually refuse to answer an incriminatory question" to invoke the privilege, that process enables the trial court to fulfill its "duty to judge whether a particular question put has the tendency to subject the witness" to self-incrimination. (*Ibid.*, italics added.) This duty requires the court to know the line of questioning, as "the court, not the individual, . . . must make the determination whether invocation of the privilege is proper." (*Ibid.*) In *Apodaca*, "[t]he privilege was asserted as to specifically identifiable matter[,] which the trial court correctly assessed as having the potential to incriminate [the witness]." (*Ibid.*) The witness's counsel was "clearly acting under the authorization of the client" when invoking her privilege, so "there is little point or sense in insisting that the client also personally invoke the privilege." (*Id.* at p. 1715.) Accordingly, the trial court properly found that the witness invoked her privilege against self-incrimination. (*Id.* at p. 1713.)

In addition, a defendant may waive or forfeit any perceived procedural objection to an invocation of privilege by agreeing the privilege exists and

11

failing to call the witness to invoke it personally. In *Cudjo*, the trial court appointed counsel to advise a defense witness and, after consulting with the witness, counsel informed the prosecutor that the witness would exercise his Fifth Amendment privilege absent a grant of immunity. (*Cudjo, supra*, 6 Cal.4th at p. 620.) The prosecutor refused to grant immunity. (*Ibid.*) After consulting with the witness and the witness's counsel, defense counsel decided not to call the witness to the stand. (*Id.* at p. 621.) On appeal, the defendant claimed "the trial court erred in failing to require that [the witness] assert under oath the privilege against self-incrimination." (*Id.* at p. 620.) Our Supreme Court rejected the argument. (*Ibid.*) Because the witness was a defense witness, defense counsel—not the trial court—bore responsibility for not calling the witness to the stand to invoke the privilege personally. (*Ibid.*)

Ultimately, in determining if a witness has a valid privilege, the court should be guided not only by the facts in evidence, but also by its perception of the unique circumstances of the case. (*Hoffman v. United States* (1951) 341 U.S. 479, 487 (*Hoffman*).) "Witnesses may refuse to answer questions calling for a potential link in a chain of evidence of guilt." (*People v. Lucas* (1995) 12 Cal.4th 415, 454 (*Lucas*).) Thus, a court may compel a witness who has invoked the privilege to testify only if "it clearly appears to the court that the proffered [testimony] cannot possibly have a tendency to incriminate the person claiming the privilege." (Evid. Code, § 404.)

b.

We conclude, on the record before us, that R.J. asserted a valid privilege against self-incrimination. R.J. was the victim of the domestic violence incident underlying the case, and the court was aware of facts about not only what Brooks had done to R.J., but also what R.J. had done to Brooks.

12

It was for that reason the court determined R.J.'s testimony could implicate Fifth Amendment issues and appointed counsel to advise her accordingly.

After discussing the issue with his client, R.J.'s counsel agreed that, absent a grant of immunity, R.J. "would" assert the Fifth Amendment to any line of questioning about her potentially assaultive behavior—a line of questioning the defense intended to pursue. The court found it does not "get[ ] much more incriminatory" than admitting to hitting another person in the head with an ashtray. R.J.'s counsel also raised the issue of privilege as to any testimony implicating substance abuse, given a pending case against R.J. for driving under the influence and his client's plainly impaired mental state the night of the fight. Based on R.J.'s counsel's assertions and its own knowledge of the unique circumstances of the case, the court tentatively found these areas of testimony privileged absent a grant of immunity. (*Hoffman*, *supra*, 341 U.S. at p. 487.) Thus, once the prosecutor declined to grant immunity, the court declared R.J. had "asserted her Fifth Amendment privilege, which makes her unavailable." Defense counsel never objected in the trial court to the propriety of this decision or the way it was reached.

Here, like in *Apodaca*, the trial court had sufficient information to assess the validity and scope of R.J.'s claim of privilege. (*Apodaca*, *supra*, 16 Cal.App.4th at p. 1714.) The court did *not* find that R.J. had a blanket privilege against testifying; indeed, the court said the defense could call R.J. to testify for other purposes, including negating the People's claim that Brooks choked R.J. Defense counsel, however, tactically decided not to call R.J. given the many "tradeoffs" identified.

We reject Brooks' argument that R.J.'s counsel's statements were mere "[i]ntentions" inadequate to "invo[ke]" the privilege. R.J.'s counsel was clear that, absent a grant of immunity, his client "would" assert the Fifth

13

Amendment on assault-related issues. He also required a grant of immunity for R.J. to testify about issues involving substance use. These are not equivocal statements.

Moreover, to the extent Brooks argues only R.J. could assert the privilege after being called and sworn, we disagree. "There can be no doubt [R.J.'s] attorney was authorized to make the[se] statement[s]," having been appointed for the express purpose of protecting R.J.'s Fifth Amendment interests. (*Apodaca*, *supra*, 16 Cal.App.4th at p. 1715.) In these circumstances, we see no reason why the representations of an officer of the court should be given less credence than a sworn witness's. To make R.J. take the stand to repeat the same assertions would have wasted judicial time and resources. (*Ibid.*) The trial court had no independent duty to do so when it had the information necessary to assess the validity of the privilege. (*Cudjo*, *supra*, 6 Cal.4th at p. 621.) If defense counsel believed the procedure insufficient, she could have called R.J. to the stand and required her to assert the privilege on a question-by-question basis. (*Ibid.*) She chose not to.

We are unpersuaded by Brooks' attempt to analogize to *Ford*, where the court rightfully rejected a speculative claim of third-party witnesses' Fifth Amendment privilege made by the defendant's counsel. As we note above, in *Ford*, the defendant and his counsel admittedly had no standing to assert a privilege on behalf of the third parties, and the trial court had no idea if the third parties would elect to waive the privilege. (*Ford*, *supra*, 45 Cal.3d at pp. 440, 442.) Here, in contrast, R.J. received counsel to represent her for the express purpose of protecting her Fifth Amendment interests, which he did after consulting with R.J. personally and conveying her refusal to testify as to certain topics absent a grant of immunity.

14

The way in which this case *is* factually similar to *Ford* does not favor Brooks. As Brooks notes, in *Ford*, the Supreme Court rejected the defendant's "claim of prosecutorial misconduct based on a belated assertion that [the witnesses] were 'unavailable'" "[b]ecause [the] defendant had not attempted to call the witnesses." (*Ford*, *supra*, 45 Cal.3d at p. 439.) The same is true here. Although the defense sought R.J.'s testimony, defense counsel never insisted that R.J. take the stand, be sworn, and invoke the privilege on a question-by-question basis. Instead, defense counsel repeatedly conceded that R.J. exercised her Fifth Amendment privilege, which was the trial court's basis for finding her unavailable. In these circumstances, defense counsel—not the trial court—bears responsibility for failing to insist that R.J. invoke the privilege in a particular manner. (*Cudjo*, *supra*, 6 Cal.4th at p. 621.)

We also find unavailing Brooks' bid to distinguish *Apodaca*, where the witness likewise validly invoked the privilege through counsel. There, as here, the witness "was fully advised of her rights," "counsel was appointed for her for the very purpose of protecting that right," the witness "consulted privately with counsel . . . on that subject," and "the attorney was authorized to make the statement." (*Apodaca*, *supra*, 16 Cal.App.4th at p. 1715.) Although in *Apodaca* the witness was sworn and sitting to testify when her counsel expressly invoked the privilege on her behalf, she herself "made no gesture, remark[,] or other indication of disapproval or disagreement." (*Id.* at pp. 1714-1715.) Her counsel's invocation was enough. Most importantly, in *Apodaca*, the trial court required the witness to testify so it could obtain sufficient information to assess the validity of the witness's potential privilege and determine if she would invoke it. (*Id.* at pp. 1714, 1716.) The

trial court here, however, already had sufficient information to make such a finding without the need for R.J. to take the stand.

Given (1) R.J.'s role in the case and (2) the court's knowledge of the facts and the defense's intended line of questioning, the trial court had sufficient information to conclude R.J.'s answers would likely "call[ ] for a potential link in a chain of evidence of guilt." (*Lucas*, *supra*, 12 Cal.4th at p. 454.)  Further, consistent with *Cudjo* and *Apodaca*, R.J. personally invoked the privilege through her authorized attorney after being given an opportunity to instead waive her rights.  (*Cudjo*, *supra*, 6 Cal.4th at pp. 620-621; *Apodaca*, *supra*, 16 Cal.App.4th at pp. 1713-1715.)  That information was sufficient for the trial court to find that R.J. invoked the broadly construed protections of the privilege against self-incrimination.[1]

On this record, we, like the trial court, are unable to conclude the testimony in question "cannot possibly have a tendency to incriminate [R.J.]" (Evid. Code, § 404.)  Accordingly, we conclude R.J. had and adequately exercised a valid Fifth Amendment privilege.  The trial court did not err when it so found.

2.

Brooks further contends the court erred in instructing the jury with CALCRIM No. 320, which he asserts "was factually incorrect" based on his

---

[1] For all these unique circumstances, *Ford*'s longstanding rule is not so inflexible as to forbid the trial judge from sustaining the witness's assertion of her privilege against self-incrimination here, contrary to the suggestion of our concurring colleague.

claim that "there was no privilege asserted."[2]  For the reasons provided above, however, we conclude R.J. validly asserted her privilege.  Accordingly, the court properly instructed with CALCRIM No. 320, which instructed the jury it was not to consider R.J.'s failure to testify in any way or speculate as to what she may have said given her invocation of the privilege against self-incrimination.

If a person successfully exercises a privilege, "neither the presiding officer nor counsel may comment thereon, no presumption shall arise because of the exercise of the privilege, and the trier of fact may not draw any inference therefrom as to the credibility of the witness or as to any matter at issue in the proceeding."  (Evid. Code, § 913, subd. (a).)  The court shall so instruct the jury if requested by a party who could be adversely affected by such an inference.  (*Id.,* § 913, subd. (b).)

---

[2]    This alleged lack of privilege is the only basis for instructional error that Brooks raises on appeal.  At trial—but not on appeal—Brooks also objected to this instruction on the ground that it would call the jurors' attention to a Fifth Amendment invocation "they did not see happen and that they're completely unaware of."  Although we understand our concurring colleague's concern about the possibility the trial court erred by alerting the jurors to a privilege invoked outside their presence (see *Cudjo, supra,* 6 Cal.4th at p. 619 ["[P]ermitting the jury to learn that a witness has invoked the privilege against self-incrimination serves no legitimate purpose and may cause the jury to draw an improper inference of the witness's guilt or complicity in the charged offense."]; but see *People v. Hill* (1992) 3 Cal.4th 959, 990 [in rejecting claim that witness should have been required to invoke the Fifth Amendment before the jury, noting the jury was instructed that "'[the witness] was called as a witness in this case outside the presence of the jury, and that [the witness] with advice of his counsel refused to testify, *basing his refusal upon his constitutional privilege against self-incrimination.*'"]), because Brooks does not argue it on appeal, that issue is not properly before us.  (See *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 419.)

Here, the prosecution requested the instruction, claiming the jury may perceive its failure to call R.J. as a witness as a failure of proof. Absent the contested instruction, the jury may have speculated as to why R.J. did not testify and may have drawn some adverse inference from that fact, despite section 913, subdivision (a)'s proscription. In these circumstances, where a valid privilege was exercised and a potentially adversely affected party requested the instruction, giving the challenged instruction was not error.

\* \* \*

In sum, we conclude R.J. asserted a valid Fifth Amendment privilege as to certain testimony, and the court thus properly instructed the jury on CALCRIM No. 320 at the People's request. Brooks argues no other reason the challenged instruction was erroneous. As we perceive no error on the asserted basis, we need not address Brooks' claim of prejudice. Likewise, we need not decide the People's claim that Brooks' instructional challenge is barred by either the doctrine of invited error or forfeiture.

## II.

Brooks next challenges the trial court's refusal to dismiss a juror for alleged bias. As discussed below, we find no fault in the court's ruling.

## A.

On the second day of trial, Juror No. 11 told a courtroom deputy "she may know one of the upcoming witnesses." The witness, A.A., also told the prosecutor that she and Juror No. 11 "work[ed] at the same place." In response to this disclosure, the judge, defense counsel, and the prosecutor all questioned Juror No. 11 outside the presence of the other jurors.

Juror No. 11 explained her working relationship with A.A. She disclosed that she and A.A. were both certified nurse aides (CNAs) working at a local hospital. Roughly 20 to 25 CNAs worked at the hospital. Juror No. 11

18

and A.A. worked the same shift but in different units. A.A. worked "not that many days a week," so their "schedules d[id]n't interact that often." As a result, in the approximately two years since A.A. joined the hospital, she and Juror No. 11 had "talked . . . maybe five times," and then only casually. As is common practice among CNAs, they exchanged phone numbers at some point so they could message one another if they needed someone to cover a shift. Although each had asked the other to cover a shift at least once, neither ever did so. Ultimately, Juror No. 11 did not "know [A.A.] well" and "ha[d not] seen her since . . . last year." Other than knowing A.A. was a student, Juror No. 11 "d[id not] know anything about her family" or "her situation."

When the judge asked Juror No. 11 if her work relationship with A.A. "might affect [her] ability to be unbiased about [A.A.'s] testimony," Juror No. 11 responded, "No." She further said their relationship would "not necessarily" "make [her] automatically assume what [A.A.] is saying is true" or "affect her jury service in any way." The prosecutor asked if Juror No. 11 would give A.A.'s testimony "any more preference or weight because [she] know[s] her," and Juror No. 11 said, "I'm probably going to treat her just like I treated this witness I just saw, so – I don't know." When asked why, Juror No. 11 explained that the case "is a story [she was] not a part of" and "ha[d not] heard anything about," so she did not believe A.A.'s testimony "w[ould] impact . . . what [she would] take into consideration." She "want[ed] to say" she would not consider "[A.A.'s] personal background, . . . but that's up for you guys to decide."

Defense counsel requested Juror No. 11 be excused. She argued Juror No. 11 and A.A.'s relationship was "more than . . . casual," and because A.A. "is half the case basically for the prosecution," "her credibility [was] of grave

19

importance." Defense counsel "c[ould] guarantee" she "would have exercised a peremptory" to excuse Juror No. 11 had she known this information earlier.

The court decided Juror No. 11 could remain on the jury. It reasoned, while "[w]e ask about the names of witnesses" during voir dire, "people don't always know people by name but know people by face," so it was "strange, though understandable perhaps," that Juror No. 11 did not raise the issue earlier. The court weighed the potential for juror bias but concluded the situation did not rise to that level. The court also did not perceive any "misconduct, so [it did] not find[ ] good cause to excuse [Juror No. 11]."

After A.A. testified, defense counsel requested the court reconsider its decision. The court said it "found the juror credible when she said that she could treat the witness as she would anybody else." Noting the two had "at most five conversations," were "not close," and had never covered a shift for the other, the court determined this was not "the type or close enough of a relationship that . . . would . . . be good cause" to remove Juror No. 11.

B.

If, upon "good cause shown," a juror is found to be "unable to perform his or her duty," the court may discharge the juror. (Pen. Code, § 1089.) "The trial court's decision whether or not to discharge a juror under section 1089 is reviewed for abuse of discretion and will be upheld if supported by substantial evidence; to warrant discharge, the juror's bias or other disability must appear in the record as a demonstrable reality." (*People v. Holloway* (2004) 33 Cal.4th 96, 124-125.)

A court abuses its discretion when it exercises it in an arbitrary, capricious, or patently absurd manner that results in a manifest miscarriage of justice. (*People v. Williams* (2013) 58 Cal.4th 197, 270-271 (*Williams*).) Substantial evidence supports a decision if, upon "review[ing] the whole

20

record in the light most favorable to the judgment," there is "evidence that is reasonable, credible, and of solid value" underlying the challenged act. (*People v. Stanley* (1995) 10 Cal.4th 764, 792 (*Stanley*).)

C.

Brooks claims Juror No. 11 should have been excused. He argues Juror No. 11 and A.A. saw one another at work and "had each other's phone numbers and would ask for favors from each other." When questioned whether she could remain impartial given this acquaintanceship, A.A. gave "equivocal" answers. Brooks also contends A.A.'s role as "the main percipient witness" and someone who "had actually involved herself in the incident" made A.A.'s credibility "crucial." Given these circumstances, Brooks argues the court erred in denying his request to remove Juror No. 11 from the jury.

We, however, disagree. Substantial evidence supports the trial judge's determination that Juror No. 11 was not biased to the point she could not fulfill her duties. The court found the relationship insufficiently close to establish good cause, noting Juror No. 11 and A.A. were "not close," had "at most five conversations" during the roughly two years they had worked together, and had never done each other a favor by covering each other's work shifts. The court expressly found credible Juror No. 11's statement she would treat A.A. like any other witness—which, contrary to Brooks' claim, is a statement Juror No. 11 made. This is "credible" and "solid" evidence supporting the refusal to excuse Juror No. 11. (*Stanley, supra*, 10 Cal.4th at p. 792.) We find ineffectual Brooks' efforts to distinguish other cases where courts have rejected a claim of purported bias based on mere acquaintanceship. In the absence of a relationship establishing demonstrable bias, A.A.'s importance to the prosecution's case is irrelevant.

21

Moreover, when a "juror's statements are conflicting or equivocal, the trial court's determination as to the juror's actual state of mind is entitled to deference." (Pen. Code, § 1089; *People v. Schmeck* (2005) 37 Cal.4th 240, 262-263.) This is because "the trial judge who sees and hears the juror" may be "left with the definite impression" of the juror's ability to execute his or her duties "[d]espite [a] lack of clarity in the printed record." (*Wainwright v. Witt* (1985) 469 U.S. 412, 425.) Here, despite Juror No. 11's less-than-definite statements under questioning, the court explicitly found credible her statement that she would not treat A.A.'s testimony differently from any other witness's. We cannot disturb that finding on appeal.

On this record, we cannot conclude the trial court abused its discretion in denying Brooks' request to exclude Juror No. 11. As the court reasonably supported its decision, it did not exercise its discretion in a patently absurd manner resulting in a miscarriage of justice. (*Williams*, *supra*, 58 Cal.4th at pp. 270-271.) We thus reject Brooks' second claim of error.

DISPOSITION

We affirm.

CASTILLO, J.

I CONCUR:


HUFFMAN, Acting P. J.

22

DO, J., Concurring.

I join the majority in affirming the judgment of conviction. But I part ways with my colleagues in their conclusion that a witness's assertion of her privilege against self-incrimination may properly be sustained without her personally appearing before the court, being sworn as a witness, and questioned. Nor am I able to join in the majority's conclusion that once a witness invokes outside the presence of the jury, the prosecution is then entitled to an instruction that informs the jury the witness has invoked her Fifth Amendment rights, only to tell it to disregard the invocation, all for the supposed purpose of avoiding the prejudicial impact of the invocation.

A.

It has been the "well established" rule for more than a century that "in order to assert the privilege against self-incrimination a witness must not only be called but must also be sworn." (*People v. Ford* (1988) 45 Cal.3d 431, 440 (*Ford*), citing *Ex parte Stice* (1886) 70 Cal. 51, 53 and *People v. Harris* (1979) 93 Cal.App.3d 103, 117 (*Harris*).) Thus " '[before] a claim of privilege can be sustained, the witness should be put under oath and the party calling him be permitted to begin his interrogation. Then the witness may invoke his privilege with regard to the specific question and the court is in a position to make the decision as to whether the answer might tend to incriminate the witness.' " (*Ford*, at p. 441, quoting *Harris*, at p. 117.)

As *Ford* explained, "The primary reason for the requirement that the witness be called and sworn was set forth by this court more than a century ago in *Ex parte Stice, supra*, 70 Cal. 51, 53: 'It is no answer to a refusal to be sworn that the petitioner asserted at the time as a reason for such refusal that his testimony would have a tendency to subject him to punishment for a felony. Such a privilege cannot be urged by the witness until a question is

put to him after being sworn, the answer to which would have the tendency stated above. Whether the answer to such question would or might be of such tendency, the court in which the trial is proceeding must adjudge [citation], and it cannot be called on to do so in advance of the question being put. To hold that the reason stated above would justify a person called in refusing to be sworn would be to make such person, and not the court, the final judge, and exclude the court from any consideration of the matter whatever. *Such is not and cannot be the law.*' " (*Ford, supra*, 45 Cal.3d at p. 440, italics added.)

Despite the clarity with which the California Supreme Court spoke in *Ford*, my colleagues in the majority describe the Court's discussion of the longstanding procedural "requirement that the witness be called and sworn" to answer specific questions before a claim of privilege can be sustained (*Ford, supra*, 45 Cal.3d at p. 440) as "seemingly definitive statements" from 35 years ago that require "context" (maj. opn., at p. 10). After doing so, the majority announces a new rule: "[S]o long as the trial judge has the information necessary to assess the existence of the privilege" (maj. opn.*,* at p. 10), the court may abandon the process that *Ford* said is a "prerequisite to [the] exercise of the privilege" (*Ford*, at p. 440).

I disagree. For one, I believe the majority's new rule is a departure from binding decisions of the California Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) For another, the majority's new rule relaxes the procedural hurdles for determining the validity of a witness's invocation of the privilege, which stands to make it easier for witnesses to avoid testifying.[1] This will almost certainly have consequences

---

[1] Witnesses and victims are often times reluctant to testify in a criminal trial, particularly in domestic violence and gang-related cases. The record in

2

for litigants' ability to compel witness testimony, consequences that (in the criminal context) could flow to either the prosecution or the accused.

I also find the majority's effort to limit *Ford* (and by extension *Ex parte Stice*) to be unpersuasive. The defendant in *Ford* testified to an alibi that certain former codefendants were with him when the crime was committed. (*Ford, supra*, 45 Cal.3d at pp. 436–437.) In closing argument, the prosecutor commented that Ford had not called those former codefendants. (*Id.* at p. 438.) The trial court granted a motion for a new trial based on the unsupported conclusion the codefendants *would* have exercised their rights against self-incrimination and that any comment upon such invocation was barred by Evidence Code section 913. (*Ford*, at pp. 438–439.)

The *Ford* court concluded it was error to grant a new trial, rejecting the defendant's assertion that "whenever a witness is or was a 'codefendant' who *may* exercise the privilege against self-incrimination the witness must be deemed 'unavailable.'" (*Ford, supra*, 45 Cal.3d at p. 439.) The Supreme Court explained that "[s]uch a rule assumes *without foundation* that any testimony of a codefendant would necessarily incriminate the codefendant, and *fails to recognize well established principles governing exercise of the privilege.*" (*Ibid.*, italics added.) In other words, because the witnesses had not been called and sworn to answer specific questions, the trial court was in no position to determine whether there was a valid basis for the witnesses to assert the privilege. (See *id.* at p. 436 [each witness "could have exercised the privilege against self-incrimination had he been called by defendant as a

---

this case illustrates this difficulty. The prosecutor noted, in her experience, that "almost in all" domestic violence cases, including the present case, the alleged victim is afraid to testify against the defendant, which often results in the victim recanting previous accusations of violence.

witness at the trial of defendant if answering the questions put to him could possibly have had a tendency to incriminate the witness"].)

The majority contends this "context" in the *Ford* decision is what "informed the Supreme Court's holding that a witness must be called and sworn." (Maj. opn., at p. 10.) In my view, this gets it backward. It was the settled rule that a witness must be called and sworn as a prerequisite to establishing the validity of an invocation of a witness's right against self-incrimination that informed the *Ford* court's holding that "[b]ecause [the] defendant did not call the witnesses and the trial court did not determine that they could exercise their privilege against self-incrimination, the prosecutor's comment was proper." (*Ford*, *supra*, 45 Cal.3d at p. 436.)

Believing themselves unconstrained by *Ford* or *Ex parte Stice*, the majority instead relies on *People v. Apodoca* (1993) 16 Cal.App.4th 1706 (*Apodoca*) as support for its pronouncement that there is "flexibility in how a witness may validly assert his or her privilege against self-incrimination so long as the trial judge has the information necessary to assess the existence of the privilege." (Maj. opn., at p. 10.) The majority reasons *Apodoca* lends support to its conclusion that a lawyer appointed for the victim in this case can properly assert her privilege to refuse to testify, although she never personally appeared before the court, was never sworn, and was never asked a single question. I believe the majority's reliance on *Apodoca* is misplaced.

*Apodoca* does not support the majority's new rule that "so long as the trial judge has the information necessary to assess the existence of the privilege," a court may disregard the process of having the witness personally appear before the court, sworn, and questioned before an assertion of privilege can be sustained. That process was observed in *Apodoca*.

4

Unlike here, in *Apodaca* the witness was on the stand testifying outside the presence of the jury when her counsel interjected, after the prosecutor asked a potentially inculpating question, to expressly invoke the privilege against self-incrimination on her behalf. (*Apodaca*, *supra*, 16 Cal.App.4th at p. 1713.) Because "the witness appeared, was sworn, placed on the stand, and was asked a specific question," and "[t]he privilege was asserted as to specifically identifiable matter which the trial court correctly assessed as having the potential to incriminate" the witness, the Court of Appeal rejected the defendant's contention that the witness was required to "personally" invoke the privilege. (*Id.* at p. 1714.) The court concluded "[i]t would be a wasteful exercise to insist that [the witness] repeat the invocation out of her own mouth *under these circumstances*, simply for the sake of formality." (*Id.* at p. 1715, italics added.) It is in this context that the court then also stated, "If the lawyer is clearly acting under the authorization of the client, and invokes the client's privilege, there is little point or sense in insisting that the client also personally invoke the privilege." (*Ibid.*)

The unique circumstances in *Apodaca* are also *not* presented here.[2] And even *Apodaca* recognized that absent such circumstances, "a witness must first be placed under oath, take the stand and actually refuse to answer an incriminatory question. [(*Ford*, *supra*, 45 Cal.3d at p. 440.)] This is because the assertion of the privilege cannot be made in a vacuum. The privilege applies only to matter which is incriminatory; it is the court's duty to judge whether a particular question put has the tendency to subject the

---

2      For example, R.J., the witness at issue here, remained outside the courtroom the two days she was "present" while her appointed counsel assertedly invoked the privilege on her behalf. Thus the trial court never spoke with her, other than to bring her into the courtroom to order her back and ultimately to excuse her.

witness to punishment for crime. It cannot do so in advance of an actual question being put. . . . (*Ibid.*)" (*Apodoca*, *supra*, 16 Cal.App.4th at p. 1714.)

Finally, I disagree with the majority that the trial court "already had sufficient information" to determine R.J. had a valid basis to assert the privilege to refuse to testify "without the need for R.J. to take the stand." (Maj. opn., at pp. 15–16.) All we have here is a colloquy between the trial court and R.J.'s appointed counsel, in which appointed counsel explicitly declined to "get[ ] into the specifics" of R.J.'s assertedly incriminating conduct, and the court stating it was "not asking [him] to disclose any particular conduct" by R.J. Left to fill in some of the gaps, it was the trial court that speculated perhaps R.J. may incriminate herself with "substance-related conduct." In my view, this is not an adequate record for a reviewing court to determine that the trial court properly sustained an assertion of privilege, which is yet another reason the process matters.

*People v. Cudjo* (1993) 6 Cal.4th 585, 616 (*Cudjo*) demonstrates this point. In *Cudjo*, a witness named Gregory was called by the prosecution to testify during a foundational hearing out of the jury's presence. After Gregory was sworn, the prosecutor asked him whether he intended to answer any questions about the murder with which the defendant was charged, and whether he had conversed with the defendant about a crime the defendant committed near the crime scene on the day of the murder. Gregory, who had been one of the murder suspects, "refused to answer *each question*, expressly grounding his refusal on the privilege against self-incrimination." (*Id.* at pp. 616–617, italics added.) The Supreme Court rejected the defendant's contention that even though Gregory "intended to assert the privilege, Gregory did not sufficiently establish that he was entitled to do so." (*Id.* at p. 617.) The Court found Gregory was entitled to assert the privilege because

6

his "[a]*nswers to the prosecution's questions . . .* could have developed evidence tending to establish Gregory's own complicity in the victim's death." (*Ibid.*, italics added.)

Although I agree Brooks did not object and thereby failed to preserve his claim that the trial court erred by finding the victim had properly invoked her privilege against self-incrimination (see *People v. Smith* (2007) 40 Cal.4th 483, 517 (*Smith*) ["A defendant may not challenge, for the first time on appeal, the procedure used by the trial court to find a witness unavailable."]; accord *Harris, supra,* 93 Cal.App.3d at p. 118), I see no reason to depart from the longstanding rule established by our Supreme Court in *Ex parte Stice* and confirmed in *Ford* that a witness must personally appear before the court, be sworn and questioned before an assertion of the privilege against self-incrimination is sustained.

### B.

A jury is not permitted to draw any inferences, for or against either the prosecution or the defense, from a witness's decision to invoke her Fifth Amendment privilege to refuse to testify. (See Evid. Code, § 913, subd. (b).) Born of the precept that a jury may not draw inferences from a witness's decision to invoke the privilege "is the equally important rule that no mention of this decision is to be made in the presence of the jury, thereby raising the possibility that an improper inference may be drawn from it." (*United States v. Sircovich* (5th Cir. 1977) 555 F.2d 1301, 1302, citing *Bowles v. United States* (D.C. Cir. 1970) 439 F.2d 536.)

Our Supreme Court has consistently held that "permitting the jury to learn that a witness invoked the privilege against self-incrimination serves *no legitimate purpose* and may cause the jury to draw an improper inference of the witness's guilt or complicity in the charged offense." (*Cudjo*, *supra*,

7

6 Cal.4th at p. 619, italics added; *Smith, supra*, 40 Cal.4th at pp. 516–517; *People v. Mincey* (1992) 2 Cal.4th 408, 441.)  For this reason, trial courts are encouraged to observe the better practice of requiring the exercise of privilege out of the presence of the jury.  (*Smith*, at pp. 516–517.)

Here, defense counsel objected to the trial court instructing the jury with CALCRIM No. 320 on the basis that R.J. asserted her privilege outside the presence of the jury:  "It would be discussing something that they did not see happen and that they're completely unaware of."  The prosecutor insisted it was entitled to CALCRIM No. 320 because it was "the victim of the case, one of the most predominant witnesses in the case" and not some generic witness, who had asserted the privilege.  The prosecutor argued the People were entitled to an explanation for failing to call the victim as a witness.  The prosecutor offered no legal authority to support this position, and I am aware of none.  Moreover any concerns the prosecutor had about weaknesses in its case for failing to call the victim was addressed by CALCRIM No. 300 ("Neither side is required to call all witnesses who may have information about the case or to produce all physical evidence that might be relevant."), which the trial court gave.

The majority, however, concludes that because R.J. asserted her privilege against self-incrimination outside the presence of the jury, the prosecution was *also* (that is, in addition to CALCRIM No. 300) entitled to an instruction that informed the jury that R.J. had invoked her Fifth Amendment rights, only to tell it to disregard the invocation, all for the supposed purpose of avoiding the prejudicial impact of the invocation.  This is illogical.

*People v. Stewart* (2004) 33 Cal.4th 425 (*Stewart*) is dispositive.  The trial court there denied a defendant's request to instruct the jury that it

8

should draw no inference from an invocation of the privilege against self-incrimination of which the jury was otherwise unaware. The trial court reasoned the defendant "had no right to the proposed instruction" because "there was no evidence before the jury that [the witness] had exercised his Fifth Amendment privilege, and because the jury would be instructed, pursuant to [former] CALJIC No. 211, that '[n]either side is required to call as a witness all persons who may have been present at any of the events disclosed by the evidence or who may appear to have some knowledge of these events[.]' " (*Id.* at pp. 472–473.) The prosecutor in *Stewart*, "arguing against [the] defendant's motion, aptly observed that defendant essentially was asking that the jury be told, 'Here's something irrelevant [under Evidence Code, section 913, subdivision (a)] . . . . Now that I've told you about, it, don't consider it.' " (*Id.* at p. 473.) And on appeal, the People in *Stewart* argued if the jury has never been told or observed that the privilege has been exercised, " 'then there is no possibility that an "unfavorable inference may be drawn by the jury because a privilege has been exercised." ' " (*Id.* at pp. 473–474.) The California Supreme Court agreed, holding that "under the circumstances presented, Evidence Code section 913, subdivision (b) did not afford defendant a right to the instruction he sought." (*Id.* at p. 474.)

So too here. The prosecutor was not entitled to CALCRIM No. 320 and the trial court erred in giving it. I conclude, however, that the error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836 [reversal required only if it is reasonably probable a result more favorable to the appealing party would have been reached absent the error]; see *Stewart*, *supra*, 33 Cal.4th at p. 474 [concluding error in instructing with similar instruction was harmless under *Watson* standard].) Two eyewitnesses watched Brooks

9

assault R.J. and the first responders' observations of her injuries established he had inflicted "significant blunt force trauma" on her.

C.

For these reasons, I concur in the majority's decision to affirm the judgment of conviction only.

DO, J.